ROBERT LEE THOMPSON *v.* STATE
OF MARYLAND

[No. 24, September Term, 1968.]

192

*Decided October 2, 1968.*

The cause was argued before MURPHY, C.J., and ANDERSON, ORTH, and THOMPSON, JJ.

*James R. White* for appellant.

*Bernard L. Silbert, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *John Henry Lewin, Jr., Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Robert Lee Thompson, the appellant, age—undisclosed in the record, home—Roaring River, North Carolina, single—"only family I got is the one that I was adopted to," testified at his trial before the court in the Criminal Court of Baltimore that he had been first convicted of a crime in North Carolina in 1958 when he served two years for the offenses of breaking and entering, larceny and receiving. Thereafter he "got locked up for being drunk," walked away from the work gang and they gave me two years for escape * * * I got locked up, again, for being drunk—the same thing happened * * * They gave

me eighteen months for escape that time." He served thirty-one months in Florida for automobile theft and his most recent arrest was in Delaware—"I was trying to get home, and they got me for soliciting a ride." He served ten days.[1] On 14 July 1967 about 9:00 A.M. he was released from the prison in New Haven, Delaware. He was given a bus token to Wilmington and the address of the Prisoner's Aid. At the Prisoner's Aid he was given $15 and he bought a bus ticket to Baltimore for $2.95. "Then I drank a little bit." He boarded a bus at 6:55 P.M. He got sick on the bus and left it 10 miles outside of Baltimore. "I caught a ride, and that's all I remember on that particular day." About three months later while he was at Clifton T. Perkins State Hospital he recalled the events of the day of 14 July.[2] He remembered that he and another man,

---

1. The criminal record of the appellant was not available at the guilt stage of his trial. The imposition of sentence was deferred and at the penalty stage of the proceedings the court had before it the F. B. I. report. It showed the following convictions in Raleigh, N. C.: 3 October 1958, guilty of housebreaking, larceny and receiving stolen goods, sentence, 2 years; 2 August 1960, guilty of being drunk on the street, sentence, 30 days; 14 October 1960, guilty of public drunkenness, sentence, 30 days; 21 October 1960, guilty of escape, sentence, 90 days; 13 December 1960, guilty of escape, sentence, 6 months (apparently he again escaped while serving the 90 day sentence); 12 October 1961, guilty of being drunk, sentence, 30 days; 1 November 1961, guilty of escape, sentence, 12 months. On 16 October 1963 he was found guilty in Miami, Florida of being a vagabond, and given a suspended sentence of 30 days. Four days later he was found guilty in St. Petersburg, Florida of being a rogue and vagabond and a 10 day sentence was suspended on condition he leave town. On 18 February 1964 in Raiford, Florida he was found guilty of larceny of an automobile and sentenced to 3 years. On 6 January 1967 in Jacksonville, Florida he was found guilty of being drunk on the street and disorderly conduct and sentenced to 10 days. In the same city on 18 March 1967 he was convicted of the same offenses and a fine of $30 was imposed. On 5 July 1967 in Wilmington, Delaware he was found guilty of a motor violation (apparently hitchhiking) and sentenced to 10 days.

2. The appellant was indicted on 31 July, arraigned on 8 August and filed a "plea of insanity" on 10 August. On 25 August he was transferred to Clifton T. Perkins State Hospital for examination

who had given him a ride, went into a store and bought a bag of potato chips. He then went back into the store to get cigarettes. The counter in the store had a "little partition" that separated one side of the counter from the other. As the storekeeper "got the cigarettes, I stepped to the end of that partition, and he grabbed me, and I said, 'What's wrong with you, you going crazy?' " And he says, "You ain't robbing me." Then the storekeeper pulled out a cap pistol. "Then I threw up my hands and I said, 'Friend, if you are going to shoot me, you are going to shoot me in the back.' Then I walked out of the place." He denied that he had a knife or that he went in the store with any intention of robbing the storekeeper. He claimed he had a couple of dollars when he went in the store but admitted that when he was arrested the police found no money on him. He was right handed "cause I got three fingers missing off my left hand." His left hand contained only the thumb and index finger.[3] He said he asked a police officer the morning after his arrest how his right arm became scratched—"I had three places on there where it looked like somebody dug their fingernails in my arm" about four inches above the wristbone —and the police officer said "that guy grabbed my arm and scratched me that I tried to rob." The appellant said that when he went into the store he "had on a shirt, a pair of pants and a pair of boots"; he did not have on a jacket or coat.

Samuel Verstandig, who, the lower court noted for the record, spoke "with a heavy foreign accent", operated a grocery

and evaluation. On 24 October a report of examination dated 20 October was filed. It expressed the opinion of the medical staff that he was competent to stand trial and that at the time of the alleged offense he "did not have a mental disease or defect which could have caused him to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." The evaluation disclosed, however, that he had numerous personality characteristics which enabled him to be classified "among the Sociopathic Personality Disturbances as an Antisocial Reaction with strong schizoid features." These personality findings did not adversely affect the opinions as to competency and responsibility for criminal conduct. The plea of insanity was withdrawn.

3. The appellant said that he lost the fingers while he was in prison in North Carolina. "I let a guy cut them off * * * with a hoe. I laid them down and let him step on the hoe."

store at 2146 Aiken Street at the corner of Bonaparte Avenue in Baltimore City. He had been robbed on three prior occasions ——"One time a guy came in, put a gun to my head and he took my money last year, Thanksgiving." On the afternoon of 14 July the appellant came into his store, took a bottle of soda from a dispensing machine and paid for it with 13 pennies. He drank the soda and left. "He was to me looking like he was drunk or under the influence of a narcotic * * * He wasn't moving straight. He was moving like drunk, or like under the influence of a narcotic. He was moving all over the store." About 10 minutes later he came back at the same time another man came in——"I don't know they came together." Each bought a bag of potato chips, taking them from the display rack. Each paid for his purchase with 10 pennies. The appellant asked Verstandig what time he closed the store. "I told him I closing nighttime, I didn't know exactly the time—I didn't tell him." The appellant walked out but in another 5 or 10 minutes returned. "He walk in, he asked me for a pack of cigarettes, same way he walk—turning, going, walking all around (indicating) * * * There was children around who I served. He ask for cigarettes, I saw him, and I, right away, I ask him what he want. He ask me for a pack of cigarettes—Pall Mall * * * I hand to him the cigarettes and he was coming behind the counter * * * the inside from the counter [4] * * * he go behind the counter * * * at the end, on the side from the counter * * * there was some papers he took out, some little papers * * * from the pants pocket (the witness did not know whether it was the right or left pants pocket) * * * He put down the papers, and I asked him, you please give me the money for the cigarettes. He told me to wait on the customers, and I told him I don't wait on the customers, please give me the thirty-two cents. Then, he, all of a sudden, pulled out a knife * * * from the pocket * * * the left part of the hip." Verstandig did

---

**4.** The cash register was four inches from the end of the counter. The appellant said that Verstandig was "up at the cash register, and I was, I would say, about four feet away from him where I stepped in between where the counter was separated * * * I was right there in between the two pieces that was open * * * The cash register was on the other end of the counter."

not remember which hand the appellant used. "Exactly I can't —I saw the knife. I saw the knife—saw like that (it was the right wrist of the appellant that was scratched)—and I catch him with the hand * * * As soon as I saw the knife like that, I catch him right away. I got no choice—I catch him from the hand * * * his wrist, and I tried to wrestle with him five minutes, and I yelled to my wife, call the police, till I find out— till he give me out the knife. And I took my toy gun, and I say, I going to shoot you, pick up the hands. He pick up the hands, and with the hands up, he walk out from the store. And this time came the police, and I go off after him with one hand the knife and one hand with my toy gun, and I go after him, and the police come over here and I point to him, and the police arrested him." Verstandig said that during the struggle for the knife he did not say anything to the appellant but the appellant said, "I'm a sick man, let me go, I don't want to rob you." He said this when Verstandig "wrestled already — I wrestled the knife from him." The knife was eight inches long and was admitted in evidence upon identification by Verstandig. When the police arrived the appellant was across the street, walking away from the store. Verstandig did not remember how the appellant was dressed—"I cannot say exactly he got a winter coat or he didn't have any." When the appellant came into the store "I saw he keep his hands like that (indicating), like he got a gun or something." It was noted for the record that the witness indicated his left hand in the left pocket area of his pants.

Only two witnesses testified at the trial, Verstandig for the State and the appellant in his own behalf. The appellant was found guilty of attempted robbery with a deadly weapon and assault. He was sentenced to 15 years on each conviction, the sentence on the assault conviction to run concurrently with the sentence on the attempted robbery conviction.

On appeal from the judgments the appellant contends that the evidence was not sufficient to sustain the convictions, urging that the "pulling" of the knife by the appellant did not show an intent to rob or assault Verstandig, that the testimony of Verstandig was "so vague, uncertain and enigmatical to be entitled to any probative force and that the evidence adduced

by the State negated larcenous intent." We do not agree that the testimony of the State's witness was not entitled to any probative force. We think it was clear in the essential details. That the witness could not positively assert that the appellant was drunk or under the influence of a narcotic, that he did not recall whether the appellant was wearing a coat and that he could not "exactly" state whether the appellant used his right or left hand to pull the knife (he indicated after extensive cross-examination that it was the left hand but it was clear that he grabbed the hand holding the knife and scratches were on the appellant's right wrist) do not compel the application of the rule enunciated in *Kucharczyk v. State,* 235 Md. 334. See *Eley v. State,* 4 Md. App. 230; *Poff v. State,* 3 Md. App. 289. These and other matters claimed to show that the testimony of the witness was equivocal, doubtful and enigmatical go at best to the weight of the evidence and do not preclude its consideration with regard to the sufficiency. As the testimony of Verstandig had probative value the question is whether the evidence before the trial court was sufficient to sustain the convictions. It is firmly established that in reviewing the sufficiency of the evidence in a non-jury case, this Court determines whether the trial court had sufficient evidence or rational inferences therefrom from which it could be fairly convinced beyond a reasonable doubt of the defendant's guilt, *Hutchinson v. State,* 1 Md. App. 362; that the weight of the evidence and the credibility of the witnesses is for the trial court to determine, *Gibson v. State,* 4 Md. App. 222; and that the findings of fact of the trial court will not be disturbed unless clearly erroneous. *Tingler and Wright v. State,* 1 Md. App. 389. We cannot say that it was not a rational inference from the evidence before the lower court in the instant case that the appellant attempted to rob Verstandig and to assault him. That the appellant entered the store on three occasions within a short period of time, that he inquired when the store closed, that the last time he came in he had no money, that he proceeded into the area affording access to the rear of the counter, that at that time Verstandig was by the cash register at the end of the counter, that when he was asked to pay for the cigarettes he "all of a sudden pulled out a knife" eight inches long, that Verstandig was obliged to

struggle with him for five minutes before being able to wrest the knife from him, and that he did not attempt to explain why he pulled the knife or why he was carrying it, but merely denied that he had such a weapon, support a finding that he attempted to rob and assault the proprietor. Attempted robbery with a deadly weapon is predicated upon a finding of intent to rob by means of intimidation produced by the use of such weapon, coupled with the apparent ability to execute the implied threat if resistance is offered. See *Jackson v. State,* 231 Md. 591. That the intended victim reacted in such a way as to frustrate the consummation of a robbery did not preclude the trial court, in the circumstances, from being fairly convinced that the appellant attempted a robbery and had the apparent ability to commit it. See *Boone v. State,* 2 Md. App. 80, 114. Nor do we believe that the evidence showed that the appellant was so intoxicated as to be incapable of entertaining the specific mental intent or of possessing the mental state requisite to the crime; he is considered criminally responsible as long as he retains control of his mental faculties sufficiently to appreciate what he is doing. *Michael v. State,* 1 Md. App. 243. We may not usurp the function of the trial court by determining whether we would have come to a different conclusion when there is legally sufficient evidence to warrant its finding. *Trout v. State,* 3 Md. App. 259; *Bury v. State,* 2 Md. App. 674. We think that there was such legally sufficient evidence here; therefore the findings of the trial court were not clearly erroneous and we may not set them aside. Md. Rules, 1086.

The appellant contends that in any event the assault conviction merged into the conviction of attempted robbery with a deadly weapon. Under the facts here existing we agree. See *Price v. State,* 3 Md. App. 155. Compare *Davis v. State,* 4 Md. App. 492; *Tender v. State,* 2 Md. App. 692.

> *Judgment as to attempted robbery with a deadly weapon affirmed; judgment as to assault vacated, the conviction thereof merging into the conviction of attempted robbery with a deadly weapon.*