# EDWIN HOWARD BAILEY *v.* STATE OF MARYLAND

[No. 526, September Term, 1971.]

*Decided August 10, 1972.*

84

The cause was argued before MORTON, MOYLAN and CARTER, JJ.

*Karl G. Feissner,* with whom were *William L. Kaplan, Thomas P. Smith, Andrew E. Greenwald, Fred R. Joseph, Walter E. Laake, Jr.,* and *Feissner, Kaplan & Smith* on the brief, for appellant.

*James G. Klair, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Reginald W. Bours, III, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The perils of the open road became stark reality when three "hippies" from Canton, Ohio, hitchhiking to a rock festival in Florida, caught a midnight ride in a station wagon occupied by three members of the Pagans motorcycle gang from Pittsburgh. One of the consequences of that bizarre odyssey from the Breezewood interchange of the Pennsylvania Turnpike to the Kenilworth Avenue exit of the Capital Beltway in Prince George's County was the conviction of the appellant, Edwin Howard Bailey, for rape [1] by Judge Daniel T. Prettyman, sitting without a jury, in the Circuit Court for Worcester County, following the removal of the case ultimately from Montgomery County by way of an intermediate stopover in Talbot County.

The primary thrust, largely by insinuation, of a defense that produced some sixteen hundred pages of testimony was that Barbara Lynn Berkshire, a then unmarried twenty-one-year-old female, by having theretofore used (albeit infrequently) both marijuana and hallucinogenic drugs and by hitchhiking about the country in the unchaperoned company of two male friends, essentially

---

1. A co-defendant, Raymond Joseph Hornichak, was convicted of rape in the Circuit Court for Talbot County prior to the trial of the appellant. He was sentenced to ten years, but eight and one-half years of that sentence was suspended and he was placed on probation. A second co-defendant, James Clokey, went on trial after the appellant. He entered a plea of guilty to rape and received a sentence of five years.

outlawed herself from the protection of the laws proscribing rape.

The astute appraisal of Judge Prettyman reached the conclusion that Miss Berkshire did, indeed, place herself in a compromising predicament:

> ". . . she did place herself in a most precarious position. You might say that if you were trying a civil case, she virtually assumed the risk of her position. She sets out, nearly at dark, in the snow, on a cold night from Canton, Ohio with two male companions who, to say the least, did not offer the appearance of a man in a gray flannel suit, and who had, over a period of time, like her, indulged in the use of dangerous or narcotic drugs, and she set out with them, with all of the equipment and all of the trappings, which would sustain them as persons who would live off the land, so to speak, in temporary shelter and, apparently, with the facilities to prepare their own food and without any visible means of support.
>
> "To hitchhike to Washington knowing, of course, that when she offered herself on the highway with her two companions, that invariably, unless a very gratuitous circumstance arose, she would be riding with strangers of all types of dispositions, in all modes of transportation, and without her having any control over the way and manner in which the transportation was operated, the direction that it went, or any detours or by-passes that it might make, and not knowing what kind of equipment, weapons, or like instruments, would be available in the automobile, or not knowing the actual physical condition of the operator.
>
> "Well, they arrived at Breezewood in the car with three drunken men, characterized so by the witnesses, which reeked of the odor of al-

cohol. To say the least, again, these did not present themselves as men in gray flannel suits; but, apparently, two of them, from the photographs and the descriptions, were rather heavy-set, burley types, and even the Defendant was supporting hair and moustache, and they didn't make him look particularly sensitive and, certainly, the other two looked far more bushy and rough, shall we say, than he did."

Judge Prettyman, in evaluating the relative gravity of this rape in the spectrum of all rapes, appreciated further that the psychic injury Miss Berkshire suffered was less than might have been suffered by more sensitive and sheltered females just as he grasped that her male companions, Donald Shank and Bruce Malcuit,[2] were less than heroic in defending her honor:

"I have reached the considered conclusion that neither Malcuit nor Shank cared a great deal whether Miss Berkshire had intercourse with these men or not, and I have reached the conclusion that they might be just as well satisfied that she did as though she hadn't. There isn't any other way to view the lackadaisical manner in which they approach this entire event. Secondly, I have reached the overall conclusion that this event was not near so serious in its impact upon Miss Berkshire, now Mrs. Malcuit, at the time as her two companions would have had the police authorities believe, or as they would now detail to us, and what I would determine righteous indignation, because I don't believe either one of them are devoted to upholding the law, or to seeing that the enforcement of the criminal law is encouraged or assisted."

Judge Prettyman's realistic appraisal of the situation

2. Miss Berkshire subsequently married Mr. Malcuit and was Mrs. Malcuit at the time of trial.

was reflected in his imposing a sentence of three years from the date of arrest. On the question of guilt, however, the nub of his decision and the ultimate retort to the broad counterattack of the defense was:

> ". . . that no matter how loose the morals of a woman may be, she still enjoys the privilege of bestowing her favors upon those men of her own selection, and not upon others whom she does not select."

A brief unfolding of the events of the evening and early morning of March 18-19, 1970, is necessary prelude to a consideration of the seven contentions raised by the appellant.

As of the afternoon of March 18, 1970, Malcuit and Shank were planning to hitchhike from their homes in Canton, Ohio, to a rock festival in Daytona Beach, Florida. Actually, they needed only to hitchhike as far as Washington, D.C., whence a friend was to drive them the rest of the way. Miss Berkshire had known both Malcuit and Shank for some months and had a romantic attachment toward Malcuit. That afternoon, the two males spontaneously proposed to her that she accompany them to Florida. Just as spontaneously, she agreed. Within an hour, she had packed a bed roll with a few necessaries and left a note for her parents. The journey began at about 4:00 p.m. with a friend dropping them off at the closest interchange of the Ohio Turnpike. Midnight brought them as far as the Breezewood interchange of the Pennsylvania Turnpike, from where Interstate 70 veered off to the southeastward and Washington.

An Oldsmobile station wagon stopped. The three travelers threw their bed rolls into its rear compartment. Malcuit and Shank climbed in amidships where the ultimate co-defendant Hornichak was seated. Miss Berkshire got in front between the appellant, who was driving, and the co-defendant Clokey. The three occupants had been drinking to some extent and continued to drink from cans of beer. Malcuit and Shank shared a can or two with them. Miss Berkshire did not partake.

The initial atmosphere was civil, if not convivial. The most significant conversation dealt with marijuana smoking. The hosts asked if the guests had any marijuana. They responded that they did not, although Shank was able to offer cigarette papers. Clokey then produced a package of marijuana, but it was too fine-grained for rolling. Conversation then centered on improvising a pipe by punching holes in a certain fashion in a beer can. The effort came to naught. During the drive, several brief stops were made for roadside urination. For most of the trip, Miss Berkshire dozed.

Sometime between two and three o'clock, the mood changed abruptly when Clokey announced to the appellant that he had not had "a train" in a long time.[3] The reference had ominous meaning for Malcuit and Shank, as well as for Miss Berkshire. Clokey then began making sexual advances toward her. She pushed him away. Shank admonished Clokey, "Cool it. She's a good chick." Clokey suddenly produced from the glove compartment a .25 calibre automatic pistol and even civility was at an end. He pointed it at Malcuit and Shank and ordered them to "Keep cool." He placed it against the head of Miss Berkshire and told her to do as she was told.

Clokey ordered her to the rear compartment of the station wagon. She and he both scrambled to it over the seats and between the rear passengers. Taking her dungarees off one leg, Clokey proceeded to rape her. He then asked Hornichak and the appellant whether they "wanted any." Hornichak declined. The appellant did not decline, stopped the station wagon, and exchanged places with Clokey. He then proceeded to rape Miss Berkshire. Almost immediately after he had finished, the station wagon arrived near the Kenilworth Avenue exit of the Capital Beltway, stopped, discharged the three passengers and their equipment and drove on.

---

**3.** An expression for a practice, voguish among motorcycle gangs, of subjecting a female to sexual intercourse with a series of men in close succession with each episode witnessed by the entire group. See *Hunt v. State*, 12 Md. App. 286, 291, n. 5.

Miss Berkshire was in tears and distraught. A police call box happened to be nearby. Shank made repeated calls and finally got through to the State Police. Trooper Paul Svoboda got the call at 3:19 a.m. and responded at 3:27 a.m. He took the report of the rape, a description of the three men and their vehicle and the fact that they were eastbound on Route 495 and would probably be proceeding toward Washington via Kenilworth Avenue. He immediately broadcast a lookout to other police in the area.

### The Legal Sufficiency of the Evidence

The factual discussion to this point is enough to demonstrate the shallowness of the appellant's contention that the evidence was legally insufficient to sustain the conviction. Whatever other defects might or might not inhere in the State's case, legal insufficiency as such was not one of them. The weight of the evidence and the credibility of the witnesses were for the trial judge. *Weaver v. State,* 226 Md. 431; *Dunlap v. State,* 1 Md. App. 444. Miss Berkshire, Malcuit and Shank all testified in elaborate detail to the entire three and one-half hour ride, culminating in the rapes. Her testimony alone would have been sufficient. *Jones v. State,* 5 Md. App. 489; *Coward v. State,* 10 Md. App. 127, 130. Trooper Svoboda testified to the immediate complaint of rape. There was no question as to the identity of the appellant, Clokey or Hornichak, who were arrested within fifteen minutes of the complaint (as will be discussed more fully hereinafter in dealing with the constitutionality of the search). The glove compartment of the station wagon produced a .25 calibre automatic pistol matching the description given by the three key State's witnesses. A vaginal examination of Miss Berkshire at 5:11 a.m. revealed sperm, non-motile but with tails still intact, indicating intercourse no earlier than 5:11 p.m. on May 18 and no later than 4:41 a.m. on May 19. Miss Berkshire had testified that, aside from the rapes, she had had no intercourse within the previous seventy-two hours. Sperm was found on the trousers of

the appellant. The appellant neither testified nor produced witnesses to testify for him. Giving due regard to the opportunity of the lower court to observe the demeanor and to judge the credibility of the witnesses under Maryland Rule 1086, we hold that the evidence showed directly facts from which he, as trier of the facts, could fairly be convinced beyond a reasonable doubt that the appellant was guilty of rape. His judgment was, therefore, not clearly in error. *Williams v. State,* 5 Md. App. 450, 458; *Metz v. State,* 9 Md. App. 15, 23.

### The Non-Motility of the Sperm Cells

A comment is in order about one of the appellant's subcontentions on the question of legal sufficiency. He bases his argument that the testimony of the examining physician, Dr. Fahrney, disproved the State's theory of the case on a subtle but misleading twist he gives to the import of that testimony. The fact that the tails had not yet separated from the bodies of the sperm cells established the earlier limit of the range within which intercourse took place. The later limit of that range was established by the fact that the sperm cells were no longer motile. Dr. Fahrney clearly testified on both direct and cross-examination that sperm cells, inside a vagina, lose their motility at some time no less than thirty minutes nor more than six hours after ejaculation. The examination was at 5:11 a.m. The only opinion as to the later limit beyond which ejaculation, with reasonable medical certainty, did not occur was, therefore, 4:41 a.m. The appellant argues that Dr. Fahrney really placed that later limit at a much earlier time, a time which would exculpate any of the Pagans.

The appellant asked Dr. Fahrney a question based upon a hypothetical opposite to the actual factual premise at bar. He asked the doctor to assume that the sperm cells he examined had been motile instead of non-motile. In that eventuality, would not the doctor have to agree, taking the range of thirty minutes to six hours for the

loss of motility, that intercourse did not occur more than six hours earlier, to wit, not earlier than 11:11 p.m. Dr. Fahrney responded, "Yes." Then, by a clever but invalid exercise of logic, the appellant assiduously sought, before the trial court and before us, to identify the earlier limit of the motile hypothetical with the later limit of the non-motile actuality. He urges the deceptively persuasive but invalid proposition that if motility establishes that ejaculation did not occur before 11:11 p.m., then non-motility establishes that ejaculation did not occur after 11:11 p.m. He chooses to ignore that between 11:11 p.m. and 4:41 a.m., the two ranges overlap and that that area of overlap is consistent with both motility and non-motility. The trial judge did not buy the appellant's logic; nor do we.[4]

## The Kucharczyk Doctrine

The appellant next seeks to discount utterly the testimony of Miss Berkshire and to argue that it should have been excluded by invoking once again the rule of *Kucharczyk v. State*, 235 Md. 334. Once again, that rule, the single manifestation of which in a criminal setting was *sui generis*, is not controlling.

Trial testimony frequently is replete with contradictions and inconsistencies, major and minor. It is the quintessential approach of the Anglo-American trial system to rely fundamentally upon cross-examination, upon the introduction of prior inconsistent statements, upon impeachment devices generally, upon sequestration, upon oral argument to ferret out and to highlight such contradictions if and when they exist. It is then at the very core of the common law trial by jury (and its counter-

---

4. The fallacy may be articulated in the formal terms of traditional Aristotelian logic. The appellant is taking the universal negative proposition, "No motile sperm are pre-11:11 (in terms of ejaculation)"—"No A is B"— and attempting to infer the so-called contrapositive of that proposition, to wit, "No non-motile sperm are post-11:11 (in purer terms, non-pre-11:11)"—"No non-A is non-B." By the laws of logic, however, the influence of the contrapositive is invalid where the starting proposition, as in the case at bar, is a universal negative.

part of a court sitting as a jury) to trust in its fact finders, after full disclosure to them, to assess the credibility of the witnesses and to weigh the impact of their testimony. The extreme and peculiar facts of *Kucharczyk* produced a limited departure from that fundamental approach. Some appreciation of the limited utility of the so-called *Kucharczyk* doctrine may be gathered from the fact that it was never applied pre-*Kucharczyk* in a criminal appeal and it has never been applied post-*Kucharczyk* in a criminal appeal.

The conviction in *Kucharczyk* for an unnatural and perverted sex act was based exclusively upon the testimony of the sixteen-year-old victim of the crime. That sixteen-year-old had a full scale I.Q. of only 56. A defense psychologist testified that the boy "did not have the ability to testify." On direct examination, he twice denied the very occurrence of the *corpus delicti* but later did testify as to its occurrence. On cross-examination, he again denied the occurrence of the *corpus delicti*. The Court of Appeals said, at 337-338:

> "Our conclusion flows from the fact that the testimony of the prosecuting witness, who was the only person that testified as to any overt act on the part of the appellant, was so contradictory that it lacked probative force and was thus insufficient to support a finding beyond a reasonable doubt of the facts required to be proven. On direct examination the boy twice testified that nothing happened in the public lavatory after the appellant gave him two drinks. On cross examination, he testified that nothing happened in the garage. Thus there were unqualified statements by the prosecuting witness that the crime for which the appellant was convicted never in fact occurred."

On those extreme facts, the Court of Appeals applied a rule applicable in civil cases that ". . . if any witness's testimony is itself so contradictory that it has no proba-

tive force, a jury cannot be invited to speculate about it or to select one or another contradictory statement as the basis of a verdict." *Kaufman v. Baltimore Transit Co.,* 197 Md. 141, 145.

Indeed, the four cases cited by *Kucharczyk* as authority well define the limits of the doctrine. Three concern themselves with whether there was sufficient evidence of negligence to take a case to the jury in the face of motions for a directed verdict or motions n.o.v. *Kaufman v. Baltimore Transit Co., supra; Baltimore Transit Co. v. Presberry,* 233 Md. 303; and *Eisenhower v. Baltimore Transit Co.,* 190 Md. 528. The fourth dealt with the sufficiency of the testimony to establish the cause of death in a Workmen's Compensation case. *Slacum v. Jolley,* 153 Md. 343. In *Slacum,* a medical expert at one point testified that heat prostration had caused death but later testified that he could not state positively what had caused death. In ruling this testimony, which was all the plaintiff had, legally insufficient, the Court said, "When a witness says in one breath that a thing is so, and in the next breath that it is not so, his testimony is too inconclusive, contradictory, and uncertain, to be the basis of a legal conclusion." In each of the three negligence cases, it was held that the evidence of negligence was legally insufficient where it hinged upon the testimony of a single witness whose trial testimony contradicted itself as to the very happening of the supposedly negligent act. Not only is the doctrine confined to unresolved contradictions within a single witness's trial testimony as to the central issue of the case, but it is further a gauge for measuring legal sufficiency of evidence and is not, as the appellant here would have it, an exclusionary device.

Despite the limited utility of the doctrine, the life of *Kucharczyk* has been amazing for the number of occasions on which and the number of situations in which it has been invoked in vain. *Kucharczyk* does not apply simply because a witness's trial testimony is contradicted by other statements which the witness has given out of court or, indeed, in some other trial. *Brooks v. Daley,*

242 Md. 185, 191-192; *Edwardsen v. State,* 243 Md. 131, 137-138; *Wilson v. State,* 261 Md. 551, 556-558; *Alexander v. State,* 4 Md. App. 214, 218; *Moore v. State,* 7 Md. App. 495, 502; *Jones v. State,* 10 Md. App. 420, 428; *Tumminello v. State,* 10 Md. App. 612, 616; *Sun Cab Company v. Carter,* 14 Md. App. 395, 407. Nor does *Kucharczyk* apply where a witness's trial testimony contradicts itself as to minor or peripheral details but not as to the core issues of the very occurrence of the *corpus delicti* or of the criminal agency of the defendant. *Bell v. State,* 2 Md. App. 471, 472; *Poff v. State,* 3 Md. App. 289, 292-293; *Chesley v. State,* 3 Md. App. 588, 596; *Eley v. State,* 4 Md. App. 230, 234; *Rasnick v. State,* 7 Md. App. 564, 568; *Lindsay v. State,* 8 Md. App. 100, 103; *Gardner v. State,* 8 Md. App. 694, 700-701; *Dorsey v. State,* 9 Md. App. 80, 87; *Pinkney v. State,* 9 Md. App. 283, 295; *Hunt v. State,* 12 Md. App. 286, 292; *Crenshaw v. State,* 13 Md. App. 361, 372. Nor does *Kucharczyk* apply where the testimony of a witness is "equivocal, doubtful and enigmatical" as to surrounding detail. *Thompson v. State,* 5 Md. App. 191, 196-197. Nor does *Kucharczyk* apply where a witness is forgetful as to even major details or testifies as to what may seem improbable conduct. *Gunther v. State,* 4 Md. App. 181, 184-185. Nor does *Kucharczyk* apply where a witness is initially hesitant about giving inculpatory testimony but subsequently does inculpate a defendant. *Wilkins v. State,* 239 Md. 692, 693. Nor does *Kucharczyk* apply where a witness appears initially to have contradicted himself but later explains or resolves the apparent contradiction. *Wilson, Valentine and Nutter v. State,* 8 Md. App. 653, 674. Nor does *Kucharczyk* apply where a State's witness is contradicted by other State's witnesses. *Scott v. State,* 2 Md. App. 709, 713-715; *Tillery v. State,* 3 Md. App. 142, 148; *Gunther v. State, supra; Hunt v. State, supra.* Nor does *Kucharczyk* apply where a State's witness is contradicted by defense witnesses. *Johnson v. State,* 3 Md. App. 219, 222. Nor does *Kucharczyk* apply where a witness does contradict himself upon a critical issue but where there

is independent corroboration of the inculpatory version. *Tucker v. State,* 237 Md. 422, 424; *Chesley v. State, supra,* 596. In each of those situations, our system of jurisprudence places reliance in the fact finder to take contradictions or equivocations properly into account and then to make informed judgment in assessing a witness's credibility and in weighing that witness's testimony. Even in a pure *Kucharczyk* situation, the ultimate resolution is solely in terms of measuring the legal sufficiency of the State's total case and not in terms of the exclusion of the contradictory witness's testimony.

### *Kucharczyk Inapplicable*

The situation at bar does not remotely invoke *Kruchar-szyk.* Out of several hundred pages of Miss Berkshire's testimony, the appellant has culled three instances where the trial testimony was allegedly self-contradictory and three instances where it was allegedly contradictory to earlier out-of-court statements. The three alleged inconsistencies in the trial testimony do not simply relate to merely minor and peripheral detail but turn out, upon a close reading of the record, to be actual misrepresentations of the evidence by the appellant, arrived at by taking partial responses out of their proper contexts.

1. He asserts that Miss Berkshire on direct examination placed Hornichak's assurance to his colleagues that he would "take care of" Malcuit and Shank "if they tried anything" at the time when Clokey and Miss Berkshire were first climbing into the rear compartment. He asserts that on cross-examination Miss Berkshire squarely contradicted herself by placing that assurance at a later time when Clokey and the appellant were changing places. The full context was as follows:

> "THE COURT: During this time of this changing back and forth, did you see the gun?
> THE WITNESS: No.
> THE COURT: During this period of time, what, if anything, did Shank and Malcuit do?

THE WITNESS: Well, wasn't really too much. Wasn't too much of anything that either one of them could do.

THE COURT: What did they do? I am not asking you what they might have done. I just want to know, what did they do?

THE WITNESS: They didn't do anything. They sat there. That is when Mr. Hornichak said that he'd watch them to make sure that they didn't do anything.

THE COURT: You mean he said this while Clokey and Bailey were changing places?

THE WITNESS: No, that was when Mr. Clokey and I were getting in the back."

2. He asserts that on direct examination, Miss Berkshire testified that Clokey pulled his levis part way down in order to have intercourse. He asserts that on cross-examination, she contradicted herself by testifying that Clokey took his trousers completely off. The full context was as follows:

"BY MR. FEISSNER:

Q. This morning you told the Court that Mr. Clokey had taken off his pants—trousers—excuse me—to accommodate his deed, is that correct?

A. Yes.

Q. You also told the Court that Mr. Bailey had taken off his trousers, or had taken them down, to accommodate his deed.

A. Yes.

Q. Did Bailey step out of his trousers?

A. I don't remember if he did or not. I don't think so.

Q. You don't remember?

A. I wasn't . . . .

Q. You would concede that it is rather difficult circumstances to be in to have a pair of trousers around your knees, in the back of a station

wagon, with three packs there, and you, would it not, ma'am?

A. There was room.

Q. I see.

But you do remember his trousers were around his knees, or were they off?

A. I don't remember.

Q. Which way? Were down, were they not?

A. Yes, they were.

Q. And Mr. Clokey had taken his off?

A. I don't remember whether he had taken them completely off. They were down, also."

3. He asserts that on cross-examination, Miss Berkshire testified that she had stopped using drugs in January or February of 1970. He asserts that this was contradictory to her earlier testimony on direct examination that she stopped using drugs the night before she got married in July of 1970. The full context of that earlier examination was as follows:

"Q. Now, Barbara, it has been some time since you have used drugs, is that right?

A. Yes.

Q. Why did you stop using drugs?

MR. FEISSNER: Objection.

THE COURT: Overruled.

THE WITNESS: I stopped, well, the night before Bruce and I got married.

Neither of us liked to do it anymore. We didn't like the effects and so we both quit.

Q. Your husband, Bruce, has stopped, also?

A. Yes.

THE COURT: When was it that you were married? July?

THE WITNESS: July.

THE COURT: Uh-huh.

BY MR. BOURS:

Q. Have you had any drugs recently prior to March 18th or 19th of 1970?

A. No.

Q. And following the 18th of March or 19th of March, 1970, and up until the time of your marriage, did you have any drugs?

A. No."

The true facts are simply not as the appellant alleges them to be.

One of the three alleged contradictions between trial testimony and earlier out-of-court statements clearly appears to be either a misunderstanding by Miss Berkshire in the course of her testimony or a misrepresentation or misunderstanding of Miss Berkshire's testimony. A statement given by Miss Berkshire to the police at 8:55 a.m. on the morning of the rape indicated that she complied with Clokey's order to place his penis in her vagina. At trial, she testified that it simply didn't happen that way and that she does not believe that she had told the police that it happened that way. Nevertheless, the alleged contradiction to that police statement was her testimony on direct examination that she "did not help him in any way." The full context permits readily the interpretation that "help" referred simply to the act of disrobing:

"A. Yes, he was taking my levis off.

Q. Did you help him?

A. No.

Q. Tell the Court just what happened after that.

A. Well, he took my levis, my one boot, just out of one leg, and, then, he pulled his levis down partway, then, he had intercourse with me.

Q. Now, did you help him in any way, or assist him in any way of doing that?

A. No."

Nor do the other two alleged contradictions necessarily establish that Miss Berkshire ever contradicted herself even by earlier out-of-court statements.

Her trial testimony, of course, was that she was raped

by both Clokey and the appellant. The letter from Dr.
Fahrney to the State Police reporting on his early morn-
ing examination of Miss Berkshire recited, apparently
on the basis of the history furnished by her, that she
had been assaulted by "one white male." Dr. Fahrney,
at trial, had no recollection of what Miss Berkshire had
told him. He had a clear recollection, however, that she
was lucid and sincere and gave no appearance whatso-
ever of being on any sort of drugs. The notes taken by
Dr. Fahrney at the time of the actual examination, on
the basis of which he later dictated the letter, simply
recite by way of history, "Patient states she was forced
to submit to sexual relations at gunpoint." The reference
in the letter could well have been an erroneous assump-
tion on the part of Dr. Fahrney on what was a peripheral
matter for his purposes.

The final contradiction relied upon by the appellant is
that at trial, Miss Berkshire testified that Clokey made
the reference about not having had "a train" in a long
time, whereas in her statement to the police, Miss Berk-
shire said that she didn't think he said anything. The
flimsy predicate for this allegation was the thumbnail
sketch given at 8:55 a.m. on March 19th in which she
summed up the entire three-hour trip in a brief para-
graph:

> "We were walking along down near Breeze-
> wood and three guys pulled over and picked up
> us. We didn't thumb, they just stopped and
> Bruce and Don got in the back and I got up
> front. We were driving along and talking about
> different motorcycle gangs. Really we didn't
> talk much at all. All I remember is I was more
> or less half asleep and the guy on the passen-
> ger's side I don't think he said anything he just
> started messing around with me and Bruce
> and Don said something to him to leave me alone.
> He got out a gun from the glove compartment
> and turned around and said to them for them

to keep quiet, then he put it against my head and asked me if I understood? He had me climb into the back and he raped me there and then they pulled over and the driver came in the back and he went up and drove the car. After that they let us out."

Even if these three alleged contradictions between Miss Berkshire's trial testimony and her earlier out-of-court statements were real and substantial, they would not make *Kucharczyk* applicable. We have grave doubts, moreover, about either their reality or their substantiality.

### The "Automobile Exception"
### The First Warrantless Search

All of the circumstances surrounding the arrests of the appellant and his two co-defendants and concerning the two separate searches of their station wagon were explored at great length in a pretrial suppression hearing before Judge Prettyman. Judge Prettyman ruled that both searches were constitutional. At trial, he declined to relitigate the issue. Our review, therefore, will be of his pretrial rulings based upon the evidence produced at the suppression hearing.

Trooper Svoboda received the complaint from Miss Berkshire, Shank and Malcuit at 3:27 a.m. He immediately broadcast an alert to all police in the area to be on the lookout for a 1966 green Oldsmobile station wagon bearing Pennsylvania license tags and occupied by three white males wearing black leather jackets. The alert included the fact that one of the males had a red beard and reddish-blonde hair. It included the fact that the three individuals were wanted in connection with a rape investigation. It included the fact that the station wagon was last seen on Interstate 495 and was probably headed toward Washington, D.C., on Kenilworth Avenue.

As a matter of fact, the station wagon, almost out of gas, stopped at the Greenbelt Shell Station located on

Greenbelt Road, just off Kenilworth Avenue. This was approximately one and one-fourth miles from where Trooper Svoboda was taking the complaint from the three witnesses at the intersection of Kenilworth Avenue with the Capital Beltway. Joseph D. Payne, the night manager at the Greenbelt Shell Station, had a radio on over which he heard the police broadcast. At that very moment, the suspect station wagon was at his service station. While two of the suspects were using the men's room, Mr. Payne called the police. The alert went out to all cars, including Trooper Svoboda's, to respond to the Greenbelt Shell Station. When Trooper Svoboda arrived there with the three complaining witnesses at 3:33 a.m., just six minutes after the initial alert, other police cars were already on the scene and the three suspects were standing outside the station wagon with their hands raised. Before anything further was done, the three victims confirmed the identity of the three suspects and of the station wagon. The three victims had, by this time, also alerted Trooper Svoboda to the fact that the three suspects possessed a pistol.

Minutes thereafter, one of the troopers searched the station wagon and produced from the closed but unlocked glove compartment, a .25 calibre automatic pistol. One of the troopers testified that the three suspects were still standing right next to the station wagon with their hands upon its roof when the search was conducted. Another trooper, however, testified that they were already handcuffed and inside various police cars at the time when this initial search was conducted. Judge Prettyman was not compelled to resolve this conflict in testimony, since he ruled that the initial search was constitutional not because it was a search incidental to a lawful arrest under *Chimel v. California*, 395 U. S. 752, but rather because it was legitimate under the so-called "automobile exception" to the warrant requirement under *Carroll v. United States*, 267 U.S. 132. Our review will be, therefore, in that frame of constitutional reference.

The first of the two necessary preconditions for the

warrantless search of an automobile—the existence of probable cause to believe that the automobile contained an instrumentality or other evidence of crime—was amply demonstrated. The appellant does not contest its establishment. The issue hinges rather upon the existence *vel non* of the second necessary precondition—exigent circumstances.

The initial search of the station wagon was made immediately after the arrest of its occupants, if not literally on the open highway, at least at a public gas station situated on an open highway. The vehicle was mobile. Until the moment that its occupants were arrested, the station wagon was a fleeting target. It was 3:33 a.m. There had been no prior opportunity for the obtaining of a search warrant. There had been no foreseeability of the crime itself or of the circumstances making a search desirable. Under such circumstances, the Supreme Court has never had difficulty in finding that exigent circumstances for the warrantless search of the vehicle were present, provided only that probable cause also existed.

The appellant seeks to negate exigency by pointing out that the occupants of the station wagon were in police custody and were therefore unable to move the vehicle. He urges that the removal or absence of the probable driver or drivers of the vehicle dissipated the elements of "ready mobility" and "fleeting opportunity to search" and thereby eroded the essential underpinnings of such cases as *Carroll v. United States, supra; Husty v. United States,* 282 U. S. 694, and our own *Owings v. State,* 8 Md. App. 572, and *Sweeting v. State,* 5 Md. App. 623, wherein no restraints were available as to the drivers or other occupants of the suspect vehicles and where the opportunity to search might be forever lost if not immediately seized. He also seeks to distinguish the situation at bar from such cases as *Scher v. United States,* 305 U. S. 251, and *Brinegar v. United States,* 338 U. S. 160, wherein the automobile searches preceded the arrests, notwithstanding arguable probable cause for the arrests even absent the fruits of the automobile searches.

He will find no solace in the decisions of either the Supreme Court or of this Court. The mere placing of a suspect vehicle's occupants in custody does not extinguish exigency, if it otherwise exists. In *Peterson, Deal and Hunt v. State,* 15 Md. App. 478, we held exigency to exist for the search of two vehicles on a liquor store parking lot, notwithstanding the prior arrest of the six occupants. In *Scales v. State,* 13 Md. App. 474, we held exigency to exist for the search of an automobile at rest on a residential parking lot late at night, notwithstanding the absence of its owner from the area. In *Johnson, Ward and Garrett v. State,* 10 Md. App. 652, we held exigency to exist for a search of an automobile on a highway, notwithstanding the arrest and removal to the police station of its occupants. In *Middleton v. State,* 10 Md. App. 18, we held exigency to exist for the search of one automobile parked on a street in Wilmington, Delaware, notwithstanding the prior arrest of its driver and his removal to the station house. We held exigency to exist for the search of another vehicle in an alley in Baltimore, notwithstanding the prior removal to the police station of the two men who had been shown to have any connection with it. In *Johnson v. State,* 9 Md. App. 166, we held exigency to exist for the search of an automobile parked upon a public street, notwithstanding the prior arrest of its owner. In *Cook v. State,* 8 Md. App. 243, we held exigency to exist for the search of an automobile parked in front of a suspect's residence, notwithstanding the prior arrest of the suspect in his apartment. In *Sutton v. State,* 8 Md. App. 285, we held exigency to exist for the search of a vehicle stopped upon a highway and then removed to a police garage, notwithstanding the fact that its four occupants were in police custody at the Waldorf Barracks. In *Johnson v. State,* 8 Md. App. 28, we held exigency to exist for the search of an automobile parked on the street, notwithstanding the detention of its owner at the police station. In *Cornish and Gilman v. State,* 6 Md. App. 167, we held exigency to exist for the search of a truck stopped on the street and then towed

to a police garage, notwithstanding the prior arrest of the driver.

The appellant's argument that the police could have kept the station wagon guarded and immobilized while a search warrant was being obtained ignores the clear voice of *Chambers v. Maroney,* 399 U. S. 42, that the Fourth Amendment requires no more for the warrantless search of the vehicle than it requires for a "warrantless seizure of the car and the denial of its use to anyone until a warrant is secured." *Chambers* points out that ". . . there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained." The Supreme Court squarely held:

> "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." p. 52.

All of the cases both before the Supreme Court and before this Court in which exigency has been held to exist contain, as does the case at bar, the important element of "unforeseeability," which was singularly lacking in *Coolidge v. New Hampshire,* 403 U. S. 443. In that case, the only Supreme Court decision ever to disallow the warrantless search of an automobile on the basis of non-exigency,[5] the police had had probable cause for the search of Coolidge's automobile for several weeks prior to its warrantless search. The opportunity to obtain a

---

5. In the other two Supreme Court decisions overturning automobile searches, *Preston v. United States,* 376 U. S. 364 (1964), and *Dyke v. Taylor Implement Manufacturing Co.,* 391 U. S. 216 (1968), probable cause was held to be lacking, and the existence of exigency *vel non* was not considered. Those decisions went off on the question of whether the automobile searches could be deemed incidents of arrest. Being removed both in space and in time from the arrests, it was held that they could not.

search warrant was literally established, *ipso facto,* by the actual obtaining of a search warrant. (It turned out to be defective.) To have argued the lack of opportunity to obtain a search warrant in *Coolidge* would have been an absurdity on its face.

The appellant's argument is self-defeating. He can only urge non-exigency by positing the right of the police to guard the vehicle and to deny its use to anyone. Yet the very circumstances which he urges would give rise to the right of the police, without a warrant, so to seize and to detain would also give rise to the right of the police, without a warrant, to search. We hold that the combination of probable cause plus exigent circumstances in the case at bar made the initial search of the station wagon constitutional. That search produced the .25 calibre automatic pistol from the glove compartment. That pistol was, therefore, properly introduced into evidence.

### The "Automobile Exception" The Second Warrantless Search

We do not feel that the second search of the station wagon, executed at approximately 9:30 a.m. that morning, requires a different holding as to its constitutionality. The basic question posed by the appellant is whether the passage of six hours between the first search and the second search would so attenuate exigency as to remove it as a justifying factor for the second search. We think not. The combination of probable cause and exigent circumstances which justified the warrantless search of the station wagon at 3:33 a.m. also justified what was in effect a warrantless seizure of the station wagon by the police at that hour. A State trooper actually kept watch over the station wagon for several of the intervening hours. During the rest of the intervening period, the station wagon was kept inside a closed bay of the service station under the watchful eye of its attendant. Whether clearly denominated as such or not, there was in effect a police seizure of the vehicle.

Under the rationale of *Chambers,* once that legitimate seizure was executed it was reasonable for the police to make a follow-up search of the vehicle at a later hour. The police were in legitimate possession of the vehicle. It had not been returned to the appellant or to anyone acting for him. Under those circumstances, the police are not required to measure each and every subsequent investigative act with respect to that vehicle in terms of the exigency of that subsequent moment as if they were searching or seizing the vehicle for the first time. *Clayton v. State,* 12 Md. App. 40.

Even if our feelings were otherwise, however, as to the constitutionality of the second search, the seizure of the black leather jackets would in any event be harmless.

That the admission of evidence seized in violation of the Fourth Amendment may constitutionally be found harmless is no longer open to question. *Harrington v. California,* 395 U. S. 250; *Richardson v. State,* 7 Md. App. 334; *Middleton v. State,* 10 Md. App. 18, 30. We are convinced beyond a reasonable doubt that the leather jackets in this case did not in any way influence the trial judge's decision. In an astute and lengthy summation of the evidence, he made no reference to jackets whatsoever. Any role they might have played in establishing the identity of the appellant was so minimal as to be nugatory. From all of the evidence, there was no dispute as to his identity. The major effort of the defense was to contest the establishment of the *corpus delicti* of non-consensual intercourse. The jackets themselves simply contributed nothing to the State's case. Even if they had had some significance, the mere introduction of them physically into evidence would have been only cumulative. Miss Berkshire, Malcuit and Shank had all testified as to having seen the jackets on all three co-defendants. Hornichak was wearing his jacket when arrested. The other jackets were observed inside the station wagon by the State Police even at the time of the initial search. The physical introduction of the jackets into evidence was inconsequential.

Subsumed within this finding of harmless error as to the second warrantless search of the station wagon is the appellant's independent contention that the jackets should not have been admitted in evidence because the State failed to prove a "chain of possession", thereby negating the possibility that the jackets might have been materially altered. Factually, the point is frivolous since the evidence was clear that a State trooper watched the station wagon for between two and three hours and that for the remainder of the time, the station wagon was in the wash bay of the Greenbelt Shell Station under the general eye of Mr. Payne. There need be only the reasonable probability that no tampering took place. *Breeding v. State,* 220 Md. 193; *Plumley v. State,* 4 Md. App. 671. What conceivable alteration there might have been in the jackets or what conceivable difference it would have made is impossible for us to fathom. The appellant does not even suggest a theory. In any event, our finding of harmlessness under the more stringent "beyond a reasonable doubt" test for constitutional error would be dispositive of any error in this regard, even if such existed, which we clearly do not believe.

## The Question of Venue

The appellant attacks the original assumption of venue by Montgomery County. The short answer to this contention is that he waived any objection to venue by his failure to make timely objection thereto and by pleading to the charges. *Cole v. State,* 232 Md. 111; *Medley v. Warden,* 210 Md. 649; *Kisner v. State,* 209 Md. 524; *Presley v. State,* 6 Md. App. 419; *Lievers v. State,* 3 Md. App. 597; Maryland Rule 725 b. Since this issue was not raised at trial and was not decided by the lower court, it is not properly before us for review. *Coward v. State,* 10 Md. App. 127; Maryland Rule 1085.

Moreover, the appellant's contention as to non-proof of venue is based upon a blatant misstatement of the evidence in his bold assertion that the, "Testimony also in-

dicates that the alleged witnesses to the assault had no idea in what State they were, much less in what county they were riding." Malcuit had once lived in the Washington suburban area (Riverdale, Maryland) for two months and was familiar with the landmarks. He testified unequivocally that the station wagon was approaching the Washington end of Interstate 70-S when Clokey got in the rear compartment with Miss Berkshire. He further testified that they had just turned off of Interstate 70-S onto Interstate 495 (the Capital Beltway) when the station wagon stopped to permit Clokey and the appellant to exchange places. Shank also testified that the station wagon traveled along Interstate 70 and eventually onto Interstate 495. He was asked what section of the road they were on when Clokey and Miss Berkshire first got into the rear compartment. He replied, within the context of that progress from Interstate 70 onto the Capital Beltway, "I think we were still on 70. I don't really know." The appellant seizes upon this answer but alters its character by ignoring the import of the word "still." He alleges simply that Shank was not even sure if they were on Interstate 70. The appellant goes on with the flagrant misrepresentation, "As a matter of fact, he [Shank] affirms that he does not even know if they were in Maryland." That answer, in a totally distinct portion of Shank's testimony, had nothing whatever to do with the situs of the rapes but referred clearly to a stop at a service station to fill a tire with air much earlier in the journey. Even to refer to it on the issue of venue is deliberately misleading.

## The Scope of Redirect Examination

The appellant complains that the State, upon its redirect examination of Miss Berkshire, was permitted to retread ground already covered in the course of direct examination. The trial judge's discretion in permitting inquiry on redirect examination is wide, particularly where the inquiry is directed toward developing facts

made relevant during cross-examination or explaining away discrediting facts. *Mills v. State,* 12 Md. App. 449. That the Assistant State's Attorney, after 107 pages of cross-examination which lasted almost twice as long as the earlier direct examination, attempted to shore up his strong points and to clear away ambiguities created by the cross-examination was simply a sound trial tactic. How much reaffirmation to permit is wisely left to the discretion of the trial judge. In the case at bar, it is to be remembered that that trial judge was sitting as a jury and that there was no lay jury to be influenced. See *State v. Hutchinson,* 260 Md. 227. Although the trial judge was extending great latitude to counsel for both sides, he did on several occasions, as the appellant points out, evidence impatience with some of the State's repetitiousness on redirect examination. If that be the case, it would appear clearly to have worked to the benefit of the appellant here and to the detriment of the State.

The appellant also adds, in attacking the latitude permitted in redirect examination of Miss Berkshire, the complaint that at one point the Assistant State's Attorney was permitted to go beyond the scope of cross-examination by eliciting testimony concerning the jackets with the word "Pagan" on the back. Not only is the control of redirect examination within the sound discretion of the trial judge, but he would be permitted to go so far as to allow the State to reopen its case, after it had been closed, for the purpose of proving important or even essential facts necessary to support a conviction. *Spillers v. State,* 10 Md. App. 643; *Jones v. State,* 2 Md. App. 356; *Boone v. State,* 2 Md. App. 80; *Tingler and Wright v. State,* 1 Md. App. 389. Moreover, what we have already said with respect to the jackets, in the constitutional context of the search and seizure and in the Maryland evidentiary context of the custody and condition of evidence, would apply here as well. If there had been error (there was not), it would have been harmless.

## The Suppression of Evidence

The final contention of the appellant is a broad attack upon the integrity of the prosecution. He alleges a "refusal to furnish clearly exculpatory evidence" and attributes it not to "prosecutorial negligence" but asserts that "it was unquestionably concealment and suppression so as to deny Defendant Bailey the fundamental fairness requirements of due process and effective assistance of counsel." He urges that this Court, "on the grounds of public policy and in its inherent supervisory powers in the administration of criminal justice," should reverse the conviction. He urges that, "As a matter of public policy, this Court should not continue to let prosecutorial suppression be a way of legal life." The appellant proceeds to furnish two particulars.

(1) Maryland Rule 728, providing for pretrial discovery and inspection, does not require the State to furnish to a defendant the statements of victims or other witnesses to a crime. On June 15, 1970, the appellant filed a Motion for Discovery and Inspection and Production of Evidence in which he demanded the "written statements of all persons known to be witnesses in this action or known to have personal knowledge of the facts and circumstances surrounding the alleged criminal offense wherein those statements may contain any evidence or information exculpatory of this defendant." The State had indicated that it had fully complied with Maryland Rule 728. On June 16, 1970, the appellant filed a Motion to Require Production of Exculpatory Evidence and Statements. He specified that he particularly desired the statements of Miss Berkshire, of Malcuit and of Shank. He complained that he had been unable to interview these witnesses because the State had not furnished him sufficient funds to travel to Canton, Ohio, for such interviews. He also complained that he had interviewed the State Police officer in charge of the investigation and that the officer had refused to show him the statements of the three witnesses. On June 19, 1970, Judge Irving

A. Levine, in the Circuit Court for Montgomery County, conducted an in-camera inspection of the statements. He found that there was nothing exculpatory therein, denied the appellant's Motion for the Production of Exculpatory Evidence and Statements and overruled the appellant's exception to the State's answers to the Motion for Discovery. We agree with Judge Levine that there was nothing exculpatory in the statement given by Miss Berkshire to the State Police. That there later turned out to be some contradictions as to surrounding details between that statement and the testimony which Miss Berkshire ultimately gave at the trial is simply a matter for impeachment at trial. It does not render the statement furnished to the State Police exculpatory evidence within the contemplation of *Giles v. Maryland,* 386 U. S. 66. We note, moreover, that appellant's counsel used the statement in minute detail in an extensive and thoroughgoing attack upon the credibility of Miss Berkshire at trial.

(2) The second item of allegedly suppressed evidence does not remotely relate to the appellant's guilt. It could not even be used as an item of impeachment of Malcuit. It is an interoffice memo from the Canton, Ohio, Police Department. It refers to a time nine months after the crime at bar. It is hearsay thrice compounded. The Assistant State's Attorney and a State trooper obtained a copy of the memorandum from the Canton Police Department. It is a communication from a captain in the Traffic Bureau to the Chief of Police, dated December 17, 1969. The traffic captain relates having received a call at his home apparently from the mother of a girl attending the Lehman High School in Canton. The daughter had apparently told the mother that "dope was being passed out and being put in girls' cokes" at a small restaurant near the high school. It was reported that the dope was being distributed during the lunch hour and after school and that "they are not selling the dope but are after followers so that they can rule the world." The daughter apparently told the mother who in turn told the police

captain that "there are a bunch of 'mainliners' hanging around this location." One of the "mainliners" was reported to be Bruce Malcuit. The appellant's counsel attempted to question one of the State troopers about this report. The State objected. It is clear that a mere unsubstantiated accusation lodged against an individual is not a grounds for impeachment. Nevertheless, this potentially inflammatory piece of hearsay thrice compounded —what the State trooper learned from the copy of an interoffice memorandum of the Canton Police Department which reported a telephone conversation made from a mother to a captain of police which, in turn, reported an apparent conversation from a high-school-aged daughter to that mother and which never revealed the source of the daughter's information—was received in evidence and was considered by Judge Prettyman. In this regard, the appellant received far more than that to which he was legally entitled. Furthermore, in view of the fact that Judge Prettyman, in announcing his findings, indicated that he was giving no credence to the testimony of Malcuit, it would have been impossible to reduce his credibility any further. Far from being denied the use of this information, the appellant was able to make an improper use of it far beyond the normal evidentiary limitations.

### A Comment on Appellate Style

Relating to no single contention but to the tone and tenor of the entire appeal, a final word is in order about style when that style is deliberately calculated to create a false impression as to mood and atmosphere. There is no indication in the record that the three hitchhikers ever exchanged names with the three occupants of the station wagon. There is no indication that the three hitchhikers ever learned the names of the three men who picked them up or ever heard the three so much as refer to each other by name. The consistent references, however, in the appellant's brief to Malcuit, Shank, Clokey,

Hornichak and the appellant as, respectively, "Bruce, Don, Jim, Ray and Ed" conveys an impression of familiarity, informality and conviviality that simply has no support in fact. Even more calculated is the repeated and persistent reference to the rape victim as "Babs." Nowhere in sixteen hundred pages of transcript is there a single reference to Miss Berkshire as "Babs" nor any suggestion that she has ever in her life been known by that nickname. The liberty the appellant takes is more than stylistic.

In a similar vein, the prosecuting witness in a rape case places her reputation to some extent in the hazard, and, in a case such as this, perhaps her entire life style as well. The latitude of permissible attack, however, does not extend to misleading statements. Miss Berkshire was never asked directly whether she was carrying a sleeping bag of her own or not. Malcuit and Shank both testified unequivocally that she was. The appellant, nevertheless, gratuitously recites in his brief, "Don and Bruce each had a sleeping bag in their packs, but Babs had only clothing in hers. Assumptively, she would join one or the other, depending upon weather, terrain, opportunity and/or her inclination." This is indicative of the general conduct of the defense which, at the trial level and on appeal, made persistent and exploitive efforts to take a witness's partial responses, omissions or testimonial confusions and to mislabel such testimony as affirmative assertions of an opposite proposition, notwithstanding other clear testimony negating the dubious inferences. The statement of facts contained in the appellant's brief and the actual trial record tell two such totally different stories that we are utterly bereft of any reliance on the former whatsoever. We look with strong disfavor upon such practices.

*Judgment affirmed.*