## State of Vermont v. Roy Girouard

[373 A.2d 836]

No. 135-76

Present: Barney, C.J., Daley, Larrow, and Billings, JJ., and Keyser, J. (Ret.), Specially Assigned

Opinion Filed March 14, 1977

124

*Francis X. Murray*, Chittenden County State's Attorney, and *Michael Goldsmith*, Deputy State's Attorney, Burlington, for Plaintiff.

*Paul D. Jarvis*, Burlington, for Defendant.

**Daley, J.** In the early morning hours of June 14, 1975, in an altercation occurring on King Street in the City of Burlington, Richard Peers was shot to death. The defendant was indicted by the grand jury for murder in the first degree under 13 V.S.A. § 2301, and was found guilty of this offense by a jury in the Addison Superior Court.

Four issues are presented here on appeal. In the first issue, the defendant contends that the trial court erred in denying his pre-trial motion to suppress evidence which he claims was obtained by a constitutionally impermissible search. Secondly, he asserts that the court should have suppressed an in-court identification which he says was tainted by an out-of-court confrontation. The third issue, raised by a motion for a judgment of acquittal pursuant to V.R.Cr.P. 29(c), challenges the sufficiency of the evidence to support the jury's verdict of first degree murder. Finally, the defendant appeals the denial of his motion for a new trial made under V.R.Cr.P. 33, in which he alleged that the court failed to instruct the jury upon the questions of premeditation and deliberation in accordance with instructions requested by him.

His principal defense is predicated upon his claim that he was unable to form the requisite intent to kill because his mental capacity at the time of the killing was impaired by the use of alcohol, drugs, or both. For these reasons, in argument upon his post-trial motions in the trial court, and by his brief and argument before us, he requests that his conviction be reduced to murder in the second degree. Even if we were inclined to do so, which we are not, we find no Vermont statutory or constitutional authority for such action.

As is our duty, we have carefully examined the record in the light of the claims of error made by the defendant and, upon such examination, conclude that we should affirm the judgment of the trial court entered subsequent to the jury's verdict which found the defendant guilty of murder in the first degree.

First, we shall deal with defendant's claims that his Fourth Amendment rights were violated by a constitutionally prohibited search and seizure. The following events culminated in the seizure in question.

At approximately 2:25 a.m. on June 14, 1975, Richard Peers and Gary Traub left a bar at 43 King Street in the City of Burlington where they had spent a part of the evening. While they were out on the sidewalk saying goodbye to some friends, a person, later identified as Leo Patch, informed them from a nearby porch that they were too noisy, and threw a large piece of wood at them. In the presence of a gathering crowd, an apparently loud, angry argument then ensued between Patch, Traub and Peers which culminated in an apology by the deceased and his friend who then moved easterly in the direction

of the parked Traub vehicle. At about this time, the defendant came out of the Red Lion Bar on King Street and came across the street in response to a request for help from Patch. Shortly thereafter, seven or eight of the persons who had congregated at the scene started proceeding, with the defendant in the forefront, toward Traub and Peers, who were walking backward facing the oncoming group.

At some point, while moving toward Traub and Peers, some scuffling ensued; the defendant pulled out a gun and fired two shots in the air. Peers pleaded with the defendant to put the gun down, but another shot was fired. As Traub and Peers went toward Traub's car, Traub was thrown to the ground and Peers was simultaneously surrounded by several people, one of whom was hitting him with something described by one person as a pair of clippers. The defendant was then seen to emerge from under an upstairs porch across from where the deceased was standing, confer with another person, rush toward Peers, and fire two shots from close range. One bullet perforated the victim's heart, the other his liver. As the shots were fired, the crowd began to run in all directions, and as the victim fell, the defendant was seen going to and departing in a vehicle which was described in great detail to the Burlington police.

Shortly thereafter, the police observed the described vehicle and stopped it, immediately recognizing the defendant as the driver. Three visible occupants were ordered out of the automobile and were frisked for weapons; no weapons were found. As one of the officers peered in the open door on the front passenger side, looking for weapons, he observed a bottle of pills and two half-full containers of beer. At this time he was standing with his feet on the pavement and his upper body inside the open doorway. On retrieving the pills, he observed a supine passenger in the back seat and went to the back seat to remove him. While the passenger was being removed, another officer, who was leaning inside the front passenger door looking for weapons, noticed an unspent .32 caliber bullet lying on the floor just in front of the passenger seat. He seized it.

## I. THE SEARCH

By his motion to suppress evidence, the defendant challenged the constitutionality of the warrantless search of the automobile he was operating at the time he was apprehended and the seizure

of the .32 caliber bullet, the bottle of pills, and the two half-full bottles of beer found in the automobile.

Since all of the circumstances surrounding the defendant's being taken into custody and the searches of the vehicle he was operating were explored in a pre-trial suppression hearing by the trial court, our review will be of the ruling denying the defendant's motion to suppress. It is true that during trial the defendant objected to the introduction of the .32 caliber bullet found in the automobile, but this objection was upon a ground having no bearing upon the issues presented at the suppression hearing.

The trial court, having heard the evidence, made findings of fact and concluded that police officers Strong and Garrow had probable cause to search the vehicle in question; a reading of its findings and the legitimate inferences to be drawn therefrom show that it determined that exigent circumstances existed.

The defendant argues that the search was not incident to a lawful arrest, was not justified by the "plain view" or "moving car" doctrines, and was not supported by the existence of probable cause to search. However, we believe that the judge's finding of constitutionality and legitimacy was under the so-called "auto exception" as enunciated in *Carroll* v. *United States*, 267 U.S. 132 (1925) and subsequent cases. Therefore, our review will be in that frame of constitutional reference, corresponding with citations employed by the trial court in its conclusions of law.

The automobile exception, as it has been enunciated and applied by the United States Supreme Court and other appellate courts, has been the subject of a penetrating analysis by the Honorable Charles E. Moylan, Jr. in a law review article: *The Automobile Exception: What It Is and What It Is Not - A Rationale in Search of a Clearer Label*, 27 Mercer L. Rev. 987 (1975).

Judge Moylan has also published a book entitled *The Right of the People to be Secure* (1976). In this latter publication Judge Moylan presents an outstanding exposition of the various types of searches and seizures recognized as being constitutionally valid under the Fourth Amendment. Among the opinions authored by Judge Moylan having to do with the warrantless search of an automobile is *King* v. *State*, 16 Md. App. 546, 298 A.2d 446 (1973). As a starting point in our discussion of the issue presented, we quote from this opinion at page 449:

The warrantless search of an automobile, under appropriate circumstances, is a long recognized exception to a fundamental proposition. That proposition is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment - subject only to a few specifically established and well-delineated exceptions." *Katz* v. *United States*, 389 U.S. 347, 357 [1967]; *Brown* v. *State*, 15 Md. App. 584, 586, 292 A.2d 762 [1972]. The "automobile exception" was specifically established in 1924, *Carroll* v. *United States*, 267 U.S. 132 [1925], and it has been well delineated, *Chambers* v. *Maroney*, 399 U.S. 42 [1970]; *Coolidge* v. *New Hampshire*, 403 U.S. 443, 458-464 [1971]. The well-delineated preconditions to its reasonable invocation are 1) probable cause to believe that the vehicle contains evidence of crime and 2) exigent circumstances.

We shall now discuss the preconditions, which in our opinion support the decision below.

## A. PROBABLE CAUSE

The defendant asserts that there was no probable cause to search his automobile at the time it was stopped, principally arguing upon the premise that since the police must have lacked probable cause to arrest, they also lacked probable cause to search. Such contention is not viable under the circumstances found by the trial court. We agree that the search was not made as an incident of the defendant's arrest, which did not occur until hours later. However, lack of probable cause to arrest does not mean that probable cause to search is also lacking. The Supreme Court has stated that "[t]he right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law." *Carroll* v. *United States*, *supra*, 267 U.S. at 158-59. See *Chambers* v. *Maroney*, *supra*, 399 U.S. at 49.

The question, then, is whether the officers were reasonable in believing the vehicle contained evidence of a crime. One of the officers who participated in the stop had seen the body, and had heard witnesses at the scene state that the victim had been shot and that the defendant was involved in the shooting. This same

officer also heard that the defendant had driven off in a light-colored 1967 Chevrolet, bearing Vermont registration AM866.

Prior to the stop, the officers who participated in the stop had also heard over police radio that an empty .32 caliber automatic casing had been found on the street 10 to 15 feet from the victim, and that a .32 automatic pistol might be involved. Further description of the Chevrolet was received, identifying it as two-tone green with a light top, and having a white fender grill.

The above information was first shown to be reliable when the officers observed a vehicle corresponding to the description in all respects. Also, the vehicle was proceeding in a direction away from the scene of the shooting within one-half hour of the incident and was within several blocks of the scene. When the vehicle was stopped, the defendant was immediately recognized as the driver. Two of the officers had known the defendant personally for years and the third officer knew him by sight.

Given the short time involved, the strong indications that a crime had been committed, the certainty that the individual apprehended was the individual named at the scene as being involved, the proven reliability of the description of the car, and the knowledge that no .32 caliber pistol had been reported as being found at the scene, the officers had probable cause to believe that the automobile contained evidence of the crime. See *Chambers* v. *Maroney, supra; Bailey* v. *State*, 16 Md. App. 83, 294 A.2d 123 (1972).

## B. EXIGENT CIRCUMSTANCES

Before deciding whether exigent circumstances exist in any particular instance, one should first determine what exigent circumstances are. In this pursuit, we shall consider some of the factors that the Supreme Court has indicated should enter into such determinations.

"The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." *Coolidge* v. *New Hampshire*, 403 U.S. 443, 461-62 (1971). However, *Coolidge* does state that " 'exigent circumstances' justify the warrantless search of 'an automobile *stopped on the highway,*' where there is probable cause, because the car is 'moveable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained.' " *Id.* at 460.

*Chambers* v. *Maroney, supra,* 399 U.S. at 50-51, states that "the circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable; moreover, the opportunity to search is fleeting since a car is readily movable."

In the same *Coolidge* footnote which expands upon the idea that potential mobility alone is not enough to justify a search, the Court cites *Chimel* v. *California,* 395 U.S. 752 (1969), and states that "[o]f course, if there is a criminal suspect close enough to the automobile so that he might get a weapon from it or destroy evidence within it, the police may make a search of appropriately limited scope." 403 U.S. at 461, n. 18. Though *Chimel* itself deals with the appropriate scope of a search pursuant to an arrest, a situation not existing in the instant case, the Court acknowledges in *Coolidge* that the proximity of a criminal suspect to the automobile may add to the existence of exigent circumstances under the *Carroll* doctrine.

In *Terry* v. *Ohio,* 392 U.S. 1, 24 (1968), the Court states, "we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." Though *Terry* is not directly on point here either, if there is an obvious need for the police to protect themselves, this would be another factor adding to the creation of exigent circumstances.

In general, as the Supreme Court said in *Cooper* v. *California,* 386 U.S. 58, 59 (1967), "whether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case. . . ." Our question becomes one of whether the totality of circumstances existing here created exigent circumstances.

Though the defendant compares this case with *Coolidge* in that exigent circumstances were lacking, we are not convinced. In *Coolidge,* the defendant "had already had ample opportunity to destroy any evidence he thought incriminating. . . . [The car] was regularly parked in the driveway of his house. . . . The objects that the police are assumed to have had probable cause to search for in the car were neither stolen nor contraband nor dangerous." 403 U.S. at 460. Furthermore, the basis of probable cause had been in police hands for several weeks (they had in fact obtained a search warrant, albeit defective), thus there was no question of whether of not it was practicable to obtain a warrant, nor were

the police confronted with an unforeseeable situation demanding an immediate search.

We find that exigent circumstances existed here. The search of the vehicle was made on the public highway. This alone might suffice under *Coolidge* and *Chambers*. The vehicle was mobile; until its occupants were removed, it was a fleeting target. Opportunity to destroy evidence had been more limited than in *Coolidge*. The unforeseeability factor mentioned in *Chambers* and lacking in *Coolidge* was present here; neither the crime itself nor the circumstances making a search desirable were foreseeable. There had been no prior opportunity to obtain a warrant, as was possible in *Coolidge*. The fact that there was a criminal suspect close enough to the car to get a weapon or destroy evidence added to the exigency. Here an individual was still in the car when the bottle of pills was discovered, and he was in the process of being removed from the car when the cartridge was discovered. The police testified that they were concerned that he might have a weapon. Also, the other three subjects at that time were in close proximity to the front passenger door, inside which the cartridge was found.

Furthermore, an unruly and hostile crowd of 15-20 people had gathered at the scene. It was 3:00 a.m. Beer bottles and coffee cups were thrown at the officers by the crowd. The officers heard voices coming from the crowd from persons who obviously knew the defendant and the defendant responding to some of them. All of these circumstances added to the risk mentioned in *Chambers* and *Coolidge* that any evidence might be removed and added to the exigency of the situation by endangering the police. In *Cardwell* v. *Lewis*, 417 U.S. 583, 595-96 (1974), the Court states that "exigency may arise at any time, and [even] the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action." This would be true a fortiori here, where the police could not have obtained a warrant earlier. There is no doubt that the situation here required prompt police action; there can be no doubt that an exigent situation existed at that time.

The defendant seeks to negate exigency by pointing out that the occupants of the vehicle could not have moved the vehicle because of their being in police custody. As was stated by Judge Moylan in *Bailey* v. *State*, *supra*, 294 A.2d at 135, and reiterated in *King* v. *State*, 298 A.2d at 452, "He will find no solace in the decisions of either the Supreme Court or of this court. The mere

placing of a suspect vehicle's occupants in custody does not extinguish exigency, if it otherwise exists."

The United States Supreme Court, speaking through Chief Justice Burger in *South Dakota* v. *Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 3096 (1976), stated, "[T]he court has . . . upheld warrantless searches where no immediate danger was presented that the car would be removed from the jurisdiction." See *Chambers* v. *Maroney*, 399 U.S. at 51-52.

As we have already determined that the totality of circumstances did create the requisite exigency, the arguments put forth here by the defendant are of no avail. Both probable cause and exigency having been shown to exist, the court properly denied the motion to suppress.

## II. THE CONFRONTATION

██ Defendant, citing *United States* v. *Wade*, 388 U.S. 218 (1967), contends that his due process rights were violated when he was identified by a witness under circumstances improperly suggestive of his guilt. He also asserts that, since the State did not clearly establish an independent origin for his in-court identification by that witness, it was tainted and should have been suppressed. We disagree with both assertions.

Again, for the factual setting, we look to the findings of fact made by the trial court at the suppression hearing. Patrolman Thomas McLaughlin of the Burlington Police Department transported the defendant from the scene of the stop to the police station. On arrival, the cruiser was parked in front of the station, about twenty feet from the front door. Patrolman McLaughlin let defendant, then neither under arrest nor handcuffed, out of the cruiser and they proceeded to walk toward the front door to the police station. The officer was walking to the rear and to one side of the defendant, but there was no physical contact between the two. Though it was nighttime, there was a street light in front of the police station and another light over the entrance of the station. When the officer and the defendant started up the steps, four or five people in the company of Detective Spernak were coming out of the building en route to the detective bureau next door. These people were prospective witnesses whom the detective was leading next door for questioning. Neither Spernak nor the witnesses had any knowledge at that time that the defendant or anyone else was being brought to the station by

an officer for any purpose. As the group of witnesses was descending the outside steps and passing defendant and Patrolman McLaughlin, one of them, Gary Traub, exclaimed: "That's him. He's the one that shot my friend." Detective Spernak asked, "Are you positive?" Mr. Traub replied, "I'm positive!"

Though other members of the group agreed to Traub's identification of the defendant, Traub was the first to speak and was the only one of them to testify at the trial. While at the scene of the shooting, less than an hour before, Traub had initially seen the defendant from a distance of five feet, holding a gun in the air. He had walked backwards three-fourths of a block up the street to where his car was parked while keeping an eye on the defendant the whole time, and he had witnessed the shooting. He estimated that defendant was in his view for a total of approximately five minutes.

*United States* v. *Wade, supra,* recognizes that "[a] major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification." 388 U.S. at 228. Defendant contends that Traub's identification was the result of a conclusion Traub drew upon seeing the defendant in police custody entering the police station. However, we hold that the confrontation was not improperly suggestive.

Suppression of identification testimony on the basis of suggestiveness is proper only as a tool to curtail improper police procedure. *Hill* v. *United States,* 367 A.2d 110 (D.C. App. 1976). Inasmuch as the setting surrounding the identification was not precipitated or arranged by law enforcement officers, the spontaneous recognition could not be attacked under either the Fifth or Sixth Amendments. *Id.*

Furthermore, as we concluded in *State* v. *Mayer,* 129 Vt. 564, 572, 283 A.2d 863 (1971), "[t]here is ample justification in the record to support the conclusion that [Traub's] identification at the trial was based entirely on his observation of the defendant at the time of the [shooting]." Observation was at a distance of five feet and for five minutes. There had been no masks, the witness's memory was fresh, and there was no doubt in his mind as to the accuracy of the identification.

In *Neil* v. *Biggers,* 409 U.S. 188, 198 (1972), the Supreme Court explained that in confrontations with witnesses, "[i]t is the likelihood of misidentification which violates a defendant's right

to due process. . . . " Substantial likelihood of misidentification did not here exist. Indeed, prompt confrontations in circumstances like this will "if anything promote fairness, by assuring reliability". *Bowler* v. *United States*, 322 A.2d 281, 282 (D.C. App. 1974). No error appears.

## III. THE EVIDENCE

By his motion for judgment of acquittal, the defendant challenged the sufficiency of the evidence to support his conviction of murder in the first degree. Our review of the record convinces us that the trial court properly denied the motion.

The relevant portion of 13 V.S.A. § 2301 reads, "Murder committed . . . by wilful, deliberate and premeditated killing . . . shall be murder in the first degree." Whether or not the defendant's act of killing was wilful, deliberate and premeditated was a question of fact for the jury. The test laid down in passing upon defendant's motion is whether the State introduced evidence fairly and reasonably tending to show defendant's guilt, or, in other words, whether the jury on the evidence would have been justified in finding him guilty beyond a reasonable doubt. *State* v. *Ballou*, 127 Vt. 1, 3, 238 A.2d 658 (1968). Although the burden of establishing these elements beyond a reasonable doubt is indisputably on the State, in passing on the motion for a judgment of acquittal, we are required to review the facts before us in a light favorable to the prosecution. *State* v. *Miner*, 128 Vt. 55, 68, 258 A.2d 815 (1969); *State* v. *Woolley*, 109 Vt. 53, 63, 192 A. 1 (1937). Since the trier of fact is given the sole determination as to the weight of the evidence, the credibility of the witnesses and the persuasive effect of the testimony, the scope of judicial review is limited. *State* v. *Pecor*, 127 Vt. 401, 403, 250 A.2d 736 (1969). Here, although inconsistent evidence was introduced, we are to exclude the effect of any modifying evidence, *State* v. *Jacques*, 130 Vt. 427, 432, 296 A.2d 246 (1972), and affirm the finding if it is supported by any credible evidence. *State* v. *Pecor, supra*, 127 Vt. at 403.

For purposes of this analysis, we shall consider the two aspects of the adequacy of the evidence which were stressed by counsel: whether there was any evidence from which the jury could find that the defendant possessed the requisite capacity at the time of the incident to premeditate and deliberate, and whether there was any evidence from which the jury could find that he did in

fact premeditate and deliberate before shooting the deceased. We note here that the defendant makes no claim that the psychiatric testimony of both experts is insufficient to support a determination that the State met its burden in proving his sanity, a defense raised by the defendant but not asserted here.

 As to the defendant's capacity to premeditate and deliberate, the testimony of two psychiatrists was introduced at trial. Based upon interviews with the defendant, a review of his previous physical and mental history, and an examination of the police reports and the statements of witnesses, the State's expert testified that in his opinion the defendant's mental and emotional processes were substantially affected by alcoholic intake on the night in question. The defendant's state of intoxication, which the doctor described as an abnormal mental condition, would in his opinion impair the defendant's behavioral controls and prevent him from making an adequate judgment about the consequences of his actions. The doctor believed that under stressful situations the defendant would probably react without coming up with designs. However, in some circumstances the defendant would be capable of premeditating and deliberating an act. The psychiatrist introduced by the defendant contended that the defendant suffered from a borderline personality, an abnormal mental condition, at the time of the event. He concluded that defendant "would be likely to be impulsive in his behavior", and "that it would have been very consistent with the record of behavior and type of personality to act impulsively."

Lay testimony also addressed the defendant's capacity at the time of the shooting. In the opinion of the owner of the Red Lion, the defendant, on leaving the bar at approximately 2:30 a.m., "probably was feeling a little good", but was not staggering and his speech was normal. The bartender at the Red Lion, who had known the defendant for 25 years, testified that on leaving the bar, the defendant's speech was "very coherent, very good" and that he was walking straight. When the car was stopped half an hour after the shooting, the defendant was apparently driving properly. On being stopped and told to get out of the car, he responded immediately, coherently stating that his door was jammed and that he would have to get out on the passenger side. Shortly thereafter, the defendant conversed with the police about various subjects. He voiced concern about valuables in his car and was especially worried about the $15.00 towing fee that

he knew would be assessed. When the crowd appeared, he responded to some of their remarks in a coherent manner. On leaving the scene to go to the police station, he commented on how the police were always "getting hassled" by people and asked about the "folks" of the officer who was accompanying him.

Later, at an interview with Detective Spernak, the defendant directly addressed his degree of intoxication, stating that he was not drunk that night, partly because he didn't want to be arrested for DWI; and he maintained that he hadn't taken any drugs in the last few days. A breath test taken at 10:55 a.m. indicated zero percent alcohol content in his breath; a pathologist later testified that the maximum alcohol content at 3:00 a.m. would have been .16 percent. The State points out that first degree murder has been upheld in Vermont where the alcohol content was .187 percent. *State* v. *Pease*, 129 Vt. 70, 271 A.2d 835 (1970).

The weight to be given to any testimony (whether expert or not) as well as the selection of testimony to be accepted are functions belonging to the jury, and, unless entirely unreasonable, must stand. *State* v. *Pray*, 130 Vt. 613, 617, 298 A.2d 859 (1972).

Expert testimony constitutes but one piece of evidence upon the elements of the crime, and the jury is not bound by it. The jury is only obliged to give the opinion the weight it deserves and is empowered to reject it entirely. Particularly, it is up to the jury to resolve conflicting evidence regarding the intoxication of the defendant, its effect upon his mental processes and whether or not his mental capacity was so diminished as to prevent him from forming the requisite felonious intent. *Id.* at 616.

We find that the evidence introduced regarding the defendant's capacity was sufficient to bring the quality of proof "well beyond suspicion and mere conjecture." *State* v. *Miner*, *supra*, 128 Vt. at 68. The jury is thus supported in its determination that the defendant had the requisite capacity at the moment in question.

Having determined that the jury was supported in deciding that the defendant had the capacity to premeditate and deliberate, we turn to the question of whether the jury was also justified in deciding that the defendant did in fact premeditate and deliberate prior to the killing. In *State* v. *Reuschel*, 131 Vt. 554, 558, 312 A.2d 739 (1973), Mr. Justice Keyser, quoting from

*State* v. *Carr*, 53 Vt. 37, 46 (1880), defines the statutory terms as follows:

> Every premeditated act is, of course, a wilful one; and deliberation and premeditation simply mean that the act was done with reflection and conceived beforehand. No specific length of time is required for such deliberation. . . . Every case must rest on its own circumstances.

It is axiomatic that murder in the first degree requires proof of murderous intent with a purpose of mind to kill as distinguished from an act done upon sudden impulse without meditation or murderous intent. *State* v. *Carr*, *supra*, 53 Vt. at 47.

Both expert and lay testimony addressed the question of whether the defendant actually did premeditate and deliberate prior to the shooting. In the opinion of the State's expert, the defendant reacted without stopping and thinking. Again, however, there was ample lay testimony from which the contrary might be inferred. For example, the owner of the Red Lion testified that at approximately 12:15 a.m. the defendant had helped quell a dispute at the bar. Other witnesses testified that when the defendant had arrived outside the bar, Leo Patch "hollered" to him to come help in a dispute in which Leo was involved. The defendant walked over and, to Patch's request that he "help get" the other two people involved in the dispute, the defendant replied, "No, I got enough trouble [of] my own". However, the defendant did join the group moving toward Peers and Traub, who were walking backwards up King Street. At some point, the defendant pulled out a gun and fired two shots in the air. The defendant then pushed the deceased, who pushed back, sending the defendant to the ground. On getting up, he said, "The next two shots are going to count." Although the victim pleaded with the defendant to put the gun down, another shot was fired while the group moved up the street. Then there was scuffling and shouting as the crowd surrounded Traub and Peers. Soon the deceased was seen standing in the street; the defendant was observed going under a porch across the street for a few moments, then emerging and crossing the sidewalk, and huddling with another individual in the center of the street. As a witness described, "It looked like they were talking to each other". The defendant and his companion both ran forward, the defendant aimed and fired two shots into the deceased, and ran away, getting into his automobile. Approximately five minutes

had elapsed between the time the defendant initially became involved and the fatal shooting.

The State's expert conceded, in light of the defendant's earlier ability to break up a fight at the Red Lion, in light of defendant's comments that he had enough problems of his own, and in light of his remark about the "next two counting", that "although it be poor judgment, there was some sort of judgmental process going on."

We conclude that the circumstances set forth above are of a quality far above speculation and conjecture on all elements of the offense charged and provided a basis for a finding or legitimate inference that the killing was in fact the result of premeditation and deliberation. Clearly, it cannot be said that there was no evidence fairly and reasonably tending to show the defendant's guilt or that the jury, upon consideration of it, was not warranted in finding him guilty beyond a reasonable doubt. There being relevant evidence tending to support the jury's determination upon all the elements of murder in the first degree, it was for the jury to construe it and determine its weight. *State* v. *Pierce*, 103 Vt. 383, 387, 154 A. 675 (1931).

## IV. THE CHARGE

The defendant maintains that the trial court, in its instructions to the jury on the issue of first degree murder, failed to comprehensively define the terms "premeditation" and "deliberation"; further, that in its instructions these elements were treated synonymously. For these reasons and the failure of the court to comply with certain requests for instructions upon these elements of the crime, he contends that the jury could have been misled to his prejudice, and therefore reversible error was committed.

The real question presented is: Did the trial court adequately and sufficiently define the elements of first degree murder?

In our consideration of this question, we are guided by the familiar rule that instructions to the jury may not be isolated into small segments and considered piecemeal, but must be measured by their full context. "If as a whole, [the charge] breathes the true spirit and doctrine of the law and there is no fair ground to say that the jury has been misled, it ought to stand," *State* v. *Rebideau*, 132 Vt. 445, 454, 321 A.2d 58 (1974). In

instructing a jury the court has a primary duty to define essential issues of fact and instruct on the law applicable to such issues even without request. It is free, however, to select its own language so long as the essential elements of the crime charged are properly before the jury. *State* v. *Audette*, 128 Vt. 374, 378, 264 A.2d 786 (1970).

In dealing with statutory language, the court has a duty to avoid confusing the issues by "over definition". *Id.* With these principles in mind, we have carefully reviewed the court's instructions and are convinced that the trial court properly instructed the jury upon all of the elements of murder in the first degree. The jury was told that, for a crime to be murder in the first degree rather than the second degree, the act must be wilful, deliberate and premeditated. If any of these elements were not proved beyond a reasonable doubt, the jury was instructed that they could not find the defendant guilty of murder in the first degree. The court defined the terms "wilful", "deliberate", and "premeditated" as they have been defined in our case law. *State* v. *Reuschel, supra*, 131 Vt. at 558; *State* v. *Carr, supra*. Whether or not the court should have elaborated upon these terms was within its discretion. *State* v. *Morse*, 127 Vt. 137, 141, 241 A.2d 328 (1968).

The charge of the court taken as a whole was full and fair to the defendant and to the State. None of the objections raised by the defendant to it demonstrates any error of law so prejudicial as to require reversal. *State* v. *Oakes*, 129 Vt. 241, 259, 276 A.2d 18 (1971).

*Judgment affirmed.*