# State of Vermont v. Michael L. Trombly

[532 A.2d 963]

No. 85-199

Present: Allen, C.J., Hill, Peck, Gibson and Hayes,* JJ.

Opinion Filed July 24, 1987

---

* Justice Hayes was present at oral argument but did not participate in the decision.

*Jeffrey L. Amestoy*, Attorney General, and *Susan R. Harritt*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Biederman & Rakow, P.C.*, Rutland, and *Patrick L. Biggam*, Montpelier, for Defendant-Appellant.

**Peck, J.** Defendant appeals from his conviction of attempted murder in the first degree. He contends that the evidence was insufficient to support the verdict and asserts numerous claims of error in the conduct of the trial. We affirm.

## I.

In the evening of July 16, 1983, the Montpelier police department received notice of a disturbance at the house where defendant lived with his wife and son. Upon arriving at the house, two officers were informed by the defendant's son that the defendant was inside the apartment with his [defendant's] wife, and inflicting physical harm upon her. The son also stated that the defendant had broken up furnishings in the apartment and had beaten him, and that he had only gotten away from his father when his mother intervened between father and son. The son also informed the police officers that the defendant had a .22 caliber rifle.

Other officers arrived at the scene. Through a window, some of the officers saw the defendant grab a woman and assault her, and all of the officers heard screams, shouting and slapping sounds. One of the officers tried to reason with the defendant through a broken window in the kitchen door, but was met by an obscene response, to which defendant added: "Come in. I got something for you." Another officer tried to negotiate with defendant over the phone, but the defendant again answered with a string of profanities that could be heard throughout the neighborhood.

While the defendant was on the phone, the officer at the kitchen door gestured to the defendant's wife to leave. Seeing his wife edge toward the door, the defendant pulled the curtain

across the broken window, bolted the door and turned out the lights, including the porch light. He later turned the outside porch light back on, illuminating a portion of the porch and the yard.

The chief of the Montpelier police force and other police officers repeatedly called the defendant and attempted to convince him to release his wife. The defendant sometimes responded by conversing in normal tones, while at other times he shouted and screamed epithets and threats at the police. Responding to one call, the defendant shouted an obscenity, telling the police that if they tried to rescue his wife, he would "shoot any cop that comes near the house."

In the early morning hours the defendant's wife persuaded him to go to sleep. After he fell into a deep sleep, with his gun resting at his side, she slipped out of the house. With Mrs. Trombly safe, the police implemented a plan to arrest the defendant. A tear gas canister was thrown toward a window, but bounced back into the yard and exploded. Wakened by the noise, the defendant challenged the police to "come a little bit closer. Let me see you so I can take care of you."

A second tear gas canister was then thrown through the broken kitchen window, and it exploded inside. The officer who threw the canister had crept close to the house to do so, and as he ran toward cover behind the garage, approximately five shots rang out in quick succession, two of which struck him in the leg. When removed from the officer's leg the two slugs were found to be hollow point bullets, which cause increased bleeding and damage. Immediately after firing the shots, the defendant called out, "Don't try that again. Come closer and I'll shoot the next one, then I'll shoot myself."

Roughly one hour later, the defendant again hailed the police, stating that he did not have the nerve to shoot himself, and that he wanted to surrender. He emerged on the kitchen porch holding a dog on a leash in one hand, and carrying his sneakers in the other. Apparently oblivious to or ignoring the officers' commands to put his hands up, the defendant tied his dog to a chain and began putting on his sneakers; calm at that point, he told the police to "go ahead and shoot."

The defendant was arraigned on charges of attempted murder in the first degree, and kidnapping; his subsequent motion to sever the two charges was granted. Trial was held on the at-

tempted murder charge in July of 1984. Defendant introduced a defense of diminished capacity in an effort to convince the jury that he lacked the ability to act with the premeditation necessary for an attempted first degree murder conviction, and that he was unable to form the requisite intent to justify a conclusion that he could have attempted first degree murder. Testifying for the defendant, two psychiatrists stated their opinion that the defendant lacked premeditated intent at the time of the shooting. They also testified that the defendant suffered from a number of personality disorders. The State stipulated to the existence of personality disorders, and did not present psychiatric testimony with regard to the defendant's ability to formulate intent.

The court instructed the jury on attempted first and second degree murder, omitting a charge on attempted manslaughter at the defendant's request. The court also instructed the jury with regard to the defense of diminished capacity. The jury returned a guilty verdict of attempted first degree murder. The defendant filed post-judgment motions for judgment of acquittal and a new trial. These motions were denied, and this appeal followed. Defendant is currently serving a sentence of no less than fifteen years nor more than twenty years.

## II.

The defendant first contends that the court erred in denying his motion for a new trial, made pursuant to V.R.Cr.P. 33. The defendant asserted in the motion, as he does on appeal, that the jury's verdict was against the weight of the evidence.

In *State* v. *Ladabouche*, 146 Vt. 279, 285, 502 A.2d 852, 856 (1985), this Court held "that a new trial based upon the weight of the evidence should be granted only where the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result." In reaching this holding, the Court rejected the "thirteenth juror" standard, stressing that the jury is the ultimate arbiter of questions of fact, *id.* (quoting *State* v. *Morrill*, 127 Vt. 506, 512, 253 A.2d 142, 146 (1969)), and that the granting of a new trial is a remedy to be used sparingly and only in exceptional circumstances. *Id.* at 284, 502 A.2d at 856 (citing *United States* v. *Phifer*, 400 F. Supp. 719, 722 (E.D. Pa. 1975)).

The gravamen of the defendant's claim of error is that no jury could reasonably have found that the defendant acted with malice after premeditation and deliberation, the elements necessary for a verdict of attempted first degree murder. See *State* v. *Girouard*, 135 Vt. 123, 138, 373 A.2d 836, 846 (1977). The defendant relies on the testimony of the two expert witnesses that he lacked the capacity to form the requisite premeditated intent, and upon the evidence of his bizarre and aberrant behavior throughout the whole episode.

In reviewing this same argument, the trial court observed that the jury was free to disregard the expert testimony, *id.* at 137, 373 A.2d at 845, and concluded that "[t]here was considerable evidence of a non-expert nature placed upon the scales in the State's favor." It cannot be said that the court abused its discretion in reaching this conclusion. Notwithstanding his aberrant conduct, the defendant's behavior throughout the confrontation did demonstrate a calculated intent to commit murder. He purposefully turned on the porch light and kept the yard area illuminated throughout most of the confrontation, carried his gun with him at all times, and repeatedly threatened the police officers who had surrounded his house. When the tear gas canister was thrown through the first floor window, he responded by firing a rapid burst of shots at the fleeing police officer from an upstairs window, using hollow point bullets, and wounded the officer twice in the leg. The verdict was supported by credible evidence; we are unable to find that the trial court abused its discretion in denying the motion for a new trial.[1]

### III.

The defendant next contends that the trial court erred in denying his pretrial motion to dismiss for lack of a speedy trial guaranteed by the Sixth Amendment to the United States Constitution. The motion was filed on April 20, 1984, nine months after

---

[1] Defendant also claims error in the denial of his motion for judgment of acquittal, made pursuant to V.R.Cr.P. 29. This motion was based on the assertion that the State had not made out a prima facie case of attempted first degree murder. As he acknowledges, the standard used to review the sufficiency of the evidence under V.R.Cr.P. 29 is more stringent than the standard applicable for a motion for a new trial under V.R.Cr.P. 33. Our determination that the trial court correctly denied the motion for a new trial thus disposes of his claim regarding the motion for acquittal.

his arraignment on July 18, 1983. Defendant does not contend that the time period between the filing of the motion and the actual date of trial three months later should be considered; accordingly, the focus of our review is the nine months leading up to the filing of his motion.

Under A.O. 5, § 2, "[c]ases in which the defendant is in custody shall proceed to trial within 90 days from the date of arraignment, except for exceptional circumstances, showing cause for temporary postponement." In determining whether a defendant's trial was improperly delayed more than ninety days, periods of delay occasioned by pretrial motions and preliminary psychiatric evaluation are omitted from consideration. *Id.* § 4; *State* v. *Williams*, 143 Vt. 396, 401, 467 A.2d 667, 669-70 (1983). A conclusion that the trial was delayed more than ninety days triggers further inquiry into the reason for the delay, the defendant's assertion of his right, and the resultant prejudice to him. *Id.* (citing *Barker* v. *Wingo*, 407 U.S. 514, 532-33 (1972)).

Defendant's claim does not successfully cross the threshold computation of the length of delay. First, he was committed to the state hospital for three of the nine month period for psychiatric evaluation of his competency to stand trial, and, at his own request, to assess his capacity to form intent at the time the offense was committed. This period is excluded from consideration. *Williams*, 143 Vt. at 401, 467 A.2d at 669.

The two month period leading up to the defendant's commitment must also be excluded, because it was occasioned by changes in his assigned counsel. He was first represented by the public defender, who withdrew on August 15, 1983, after discovering a conflict of interest. His next assigned counsel also discovered a conflict shortly thereafter and was forced to withdraw as well. A new assignment was made, and this counsel participated in the proceedings that resulted in defendant's commitment to the state hospital on September 20, 1983. In *United States* v. *Cameron*, 510 F. Supp. 645, 649-50 (D. Md. 1981), the defendant discharged his attorney on the eve of trial, and then, following the resultant delay, filed a motion to dismiss for lack of a speedy trial. The court held that the delay was caused by the defendant's change in counsel, and omitted the period caused by the change from the computation of the period of delay. In this case, the defendant did not personally cause the changes in counsel required by the conflicts faced by assigned counsel. Nonetheless, assigned

counsel stands in the shoes of counsel hired by a defendant, see *In re Shuttle*, 125 Vt. 257, 258, 214 A.2d 48, 49 (1965), and delay arising out of the relationship between attorney and client must be attributed to the defendant, and omitted from consideration.

The period of twenty-three days following defendant's release from the hospital was also taken up by proceedings involving defendant's counsel. Sometime before January 11, 1984, the defendant informed the court that his attorney was conspiring with the state's attorney against him, and sought replacement of that counsel. Based on the apparent breakdown in communications between attorney and client, the court granted the request on January 11, 1984. This delay was instigated by the defendant himself, and thus comes directly under the holding in *Cameron*, and is excluded from computation of his speedy trial claim.

■ Of the remaining three months and nine days before defendant filed his motion, fifty-two days were the result of pretrial motions filed by the defendant, and must also be excluded from consideration. A.O. 5, § 4(a); *Williams*, 143 Vt. at 401, 467 A.2d at 670. There remains only a delay of forty-eight days; denial of the motion was therefore proper.

## IV.

Defendant claims that the prosecutor made improper and prejudicial remarks during closing argument. Premising his argument on the fact that the key element in the case was the existence of premeditated intent, defendant identifies the following statements as proscribed, because they provide comment on the credibility of the psychiatric experts called by the defense:

> *I believe* Dr. King was probably conned from the facts he was given at least from his conclusions . . . .
>
> I have very little to talk about Dr. Payson. *I didn't find* his testimony to be much. I don't think you will. (Emphasis added.)

In addition, defendant points to the statement made by the prosecution to explain why it had not called its own psychiatric expert:

> You can assume that *we didn't believe* that those psychiatrists [called by the defense] would convince you people that this man did not intend to kill that man. (Emphasis added.)

Immediately after the last comment, the defendant raised an objection, and the following cautionary instruction was given:

> THE COURT: Ladies and gentlemen, I am sure you understand that you are to determine the case on the evidence and the law. The personal beliefs expressed by any of the attorneys of course have no bearing on the case and should be disregarded by you.

■ Closing argument, "in which the prosecutor makes inflammatory statements or appeals to the sympathies of the jury, or injects into the case his personal belief as to the guilt of the accused," is improper. *State v. Bubar*, 146 Vt. 398, 403, 505 A.2d 1197, 1200-01 (1985). Even improper remarks may not result in reversal, however, for the defendant must also demonstrate their prejudicial effect on his right to a fair trial. *State v. Hemingway*, 148 Vt. 90, 91, 528 A.2d 746, 748 (1987). The assessment of prejudice in each case must take into account the context of the suspect remarks. Viewed in context, a promptly given curative instruction may remove the taint of improper comment. *State v. Percy*, 146 Vt. 475, 479, 507 A.2d 955, 957 (1986); *State v. Hamlin*, 146 Vt. 97, 105, 499 A.2d 45, 51 (1985).

■ In this case, the challenged comments addressed the credibility of the expert witnesses. While their credibility was a fair subject for comment, *State v. Gates*, 141 Vt. 562, 567, 451 A.2d 1084, 1086 (1982), injection of the prosecutor's personal opinion was improper. Although the comments were improper, it cannot be said that prejudice requiring reversal occurred. The comments related to the witnesses' credibility rather than the defendant's guilt or innocence. Moreover, any aspersion cast by the comments on the credibility of the witnesses was defused by the court's prompt admonition to the jury to disregard expressions of personal belief. While we do not condone the prosecutor's comments, we cannot say the remarks mandate reversal, when viewed in the context in which they were made.

## V.

■ Defendant next presents several claims of error in the jury charge. He first contends that the court erred in refusing to instruct the jury on attempted voluntary manslaughter. A review of the transcript reveals that, at the precharge conference, defend-

ant's counsel vehemently opposed such an instruction.[2] No objection was made to the charge when it was presented to the jury. In the absence of an objection, and where an instruction is consistent with the request to charge, any claim of error in that instruction is waived. Absent plain error, the claim is not reviewable on appeal. *State* v. *Hoadley*, 147 Vt. 49, 52-53, 512 A.2d 879, 881 (1986); *State* v. *Parker*, 139 Vt. 179, 183, 423 A.2d 851, 853 (1980).

In determining whether plain error occurred, consideration must be given to the fact that even where no request is made, the court must "charge fully and correctly upon each point indicated by the evidence . . . ." *State* v. *Brisson*, 119 Vt. 48, 53, 117 A.2d 255, 258 (1955). In this case, not only did defendant not request an instruction on attempted voluntary manslaughter, but instead he vociferously explained at the charge conference why the charge should not be given. Counsel stated at length his belief that no reasonable jury could return a verdict of attempted manslaughter from the facts presented to them, and that an instruction would thus be inappropriate.

The crime of voluntary manslaughter was early defined as

"the unlawful killing of another, without malice, . . . as when the act is committed *with a real design and purpose to kill, but through the violence of sudden passion occasioned by some great provocation*, which in tenderness for the frailty of human nature the law considers sufficient to palliate the offenee [sic]; . . . . Every man, when assaulted with violence or great rudeness is inspired with a sudden impulse of anger which puts him upon resistance before time for cool reflection, and if during that period he attacks his assailant with a weapon likely to endanger life, and death ensues, it is regarded as done through heat of blood, or violence of anger, and not through malice or that cold blooded desire of revenge which more properly constitutes the feeling, emotion or passion of malice."

*State* v. *McDonnell*, 32 Vt. 491, 545 (1860) (quoting *Webster's Case*, 5 Cush. 295) (emphasis in original); see also *In re Estate of Mahoney*, 126 Vt. 31, 35, 220 A.2d 475, 478 (1966) (voluntary

---

[2] While it is contended that counsel did so at defendant's request and against counsel's strategy, there is no support for this assertion in the record.

manslaughter is distinguished by the absence of malice, with the intent caused by a heat of passion). Under the facts of this case, the trial court did not err in accepting defense counsel's assertion that the attack on the police officer could not have been seen reasonably as arising from the heat of passion. It was not plain error to put only the charges of attempted first and second degree murder before the jury, as requested.[3]

■ Defendant next asserts that the following part of the charge was error:

> If you find Mr. Trombly is not guilty of the charge submitted to you, you should not assume that he will escape punishment altogether for the shooting of Officer Moody, or his treatment of Mrs. Trombly. He may or may not, at the State's option, be tried on other possible offenses at another time and that is not your concern nor my concern.

The instruction was provided, without subsequent objection, at the defendant's request, and thus comes under the plain error standard of review under *Parker*. Defendant requested this instruction in order to avoid a situation in which the jurors might conclude that he was not guilty of the offenses for which he was charged, but, believing he was guilty of some offense based on the evidence, and, out of concern that he would go unpunished if acquitted, they would convict him nonetheless. See *Beck* v. *Alabama*, 447 U.S. 625, 630 (1980); see generally Blair, *Constitutional Limitations on the Lesser Included Offense Doctrine*, 21 Am. Crim. L. Rev. 445, 471-72 (1984). As explained by defendant's counsel at the charge conference, the intended effect of this limiting instruction was to protect the defendant from a jury that would be hesitant to acquit if it believed he would escape punishment, by explaining that acquittal is not the only consequence that could ensue. In view of its arguably protective function, the instruction was not plain error.

■ The defendant also contends the court erred in refusing to instruct the jury that the police officers were attempting to illegally arrest him when they threw the tear gas canister into his

---

[3] It should also be noted that the charge of attempted second degree murder gave the jury the option to return a lesser verdict if it had concluded that attempted first degree murder was inappropriate or excessive. The jury's failure to do so reduces the force of his argument that he was prejudiced by the omission of an attempted manslaughter instruction.

home, and that he had a right to resist such an unlawful arrest. This claim is without merit. Even were the arrest unlawful, the defendant would have been entitled to use deadly force only if he

> believed and had reasonable grounds to believe that he was in danger of death or great bodily harm at the hands of the officer and in the exercise of reasonable judgment there were no other safe means of averting the real or apparent danger except to kill the officer.

*Morris* v. *Commonwealth*, 411 S.W.2d 678, 680 (Ky. 1967). Resort to deadly force was not the defendant's only alternative under these circumstances, and the error, if any, in the court's refusal to instruct the jury that the defendant had been illegally arrested was harmless.

■ The defendant also asserts that the court erred in failing to give a missing-witness instruction. A missing-witness instruction informs the jurors that they may draw an inference against a party who fails to call a witness whose testimony would apparently be useful to that party. See *Choiniere* v. *Sulikowski*, 126 Vt. 274, 279, 229 A.2d 305, 309 (1967). The defendant claims that the jury should have been instructed that it could infer from the State's failure to call an expert psychiatric witness that the missing testimony would have corroborated the defense's expert testimony that the defendant lacked the capacity to form premeditated intent. A missing-witness instruction is only proper if the inference to be drawn is a "natural and reasonable one." *United States* v. *Bramble*, 680 F.2d 590, 592 (9th Cir. 1982) (citations omitted). Here, where no particular witness within the State's control was even identified as missing, see *United States* v. *Lamp*, 779 F.2d 1088, 1097 (5th Cir. 1986), an inference that any or all psychiatric experts would necessarily have testified against the State may not be drawn so easily as the defendant claims. The court's refusal to provide the requested instruction was not error.

## VI.

Defendant next presents several claims of error in the court's conduct of the trial proceedings other than the jury charge. He first contends that sequestration of the jury was improper. Sequestration was on motion of the defendant, and the court's ac-

quiescence to this tactical decision of defendant's counsel will not be disturbed on appeal. See *United States* v. *Calabro*, 467 F.2d 973, 985-86 (2d Cir. 1972) ("American Bar Association Project on Standards for Criminal Justice concludes that a defendant is entitled to make the ultimate decision only in regard to whether to plead guilty, whether to waive a jury, and whether to testify; 'all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his client.' ").

Defendant's claim of error in the admission of two prior criminal convictions is unpersuasive for this same reason. The prosecutor introduced one of the convictions on direct examination without objection, and the subject of the charge and the circumstances surrounding it was pursued by the defendant on cross-examination. Defendant himself raised the second conviction during direct examination of another witness. The witnesses clearly were questioned about these convictions as part of a strategy of showing defendant's inability to form premeditated or malicious intent. Thus, not only was there lacking an objection upon which the judge could have ruled, but the defendant was responsible for the admission of the evidence of which he now complains.

The defendant also contends the court erred in making comments to the jury about a sniper incident that occurred in California during the trial. At the defendant's request, the court admonished members of the jury that they should not allow their feelings about the events in California to have an effect on their consideration of his case. Defendant's request must be viewed as a strategic choice, and the court's decision to accede to the request, made amidst the nuances of a complex trial, was not an abuse of discretion.

Defendant next asserts the court erred in refusing to order defendant's counsel, against counsel's judgment, to call two witnesses whose testimony the defendant wished presented. While the decision about which witnesses to call is a tactical one, this claim of error differs from the other asserted tactical errors in that defendant's objection, to his counsel's decision and reasons therefor, were placed on the record during a chambers conference. The proposed testimony under dispute was described, and the court inquired into the defendant's reasons for wanting the testimony presented, and his attorney's reasons for wanting it excluded. Counsel explained that the witnesses were disreputable,

and would likely work against the defendant rather than in his favor. Based on this record, no error appears in the court's deference to counsel's tactical decision.

Defendant also claims the court should have informed him that he was free to discharge his attorney and appear pro se if he was unhappy with his attorney after this conference concluded. Defendant in no way intimated to the court that a breakdown in communication had occurred, however, and did not move to have counsel removed. This was a tack he was clearly able to undertake, as evidenced by his successful efforts to have his previous counsel discharged. Under these circumstances, there was no reason to disrupt the proceedings further, and defendant's contention is without merit. See *United States* v. *Malizia*, 437 F. Supp. 952, 955 (S.D.N.Y. 1977) (Defendant's right to discharge counsel and represent himself after trial has begun must be balanced against potential disruption of proceedings in progress.); see also *State* v. *Truman*, 124 Vt. 285, 291, 204 A.2d 93, 97 (1964) (Right to discharge counsel and substitute another must be balanced against resulting prejudice to other party and interference with the administration of justice.).

Defendant next claims error in the court's encouragement of the jury to continue their deliberations after they had given some indication that they had become deadlocked. The record is devoid of any indication that the court's actions in any way coerced the jury or attempted to "intimidate an opinion as to what the verdict ought to be." *State* v. *Sousa*, 29 N.C. App. 473, 478, 224 S.E.2d 682, 685 (1976). There was no error in the court's action.

Finally, defendant contends that his case was prejudiced by his counsel's argument with two members of the jury during voir dire. Defendant does not identify the two jurors with whom he believes his counsel argued, and there is no glaring evidence of such a confrontation in the approximately three hundred pages which make up the voir dire record. Absent supporting argument, this claim will not be reviewed. *State* v. *Gravelle*, 117 Vt. 238, 247, 89 A.2d 111, 117 (1952).

*Affirmed.*